**THE SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**The Arapaho Indian Tribe of the Wind River Reservation, Wyoming, Plaintiff,**

v.

**The United States, Defendant.**

**Nos. 79–4582 L, 79–4592 L.**

United States Court of Federal Claims.

May 27, 2010.

Order Amending Opinion and Judgment Aug. 5, 2010.

Harry R. Sachse, Washington, DC, for the Shoshone Indian Tribe. William F. Stephens, Washington, DC, of counsel.

Richard M. Berley, Seattle, WA, for the Arapaho Indian Tribe. Brian W. Chestnut, Seattle, WA, of counsel.

Terry M. Petrie, Natural Resources Section, Denver, CO, with whom was John C. Cruden, Acting Assistant Attorney General, U.S. Department of Justice, Environment and Natural Resources Division, Washington, DC, for defendant.

## OPINION

HEWITT, Chief Judge.

Before the court are Defendant's Motion for Judgment on the Pleadings as to Claim II for Oil and Gas Phase Two (defendant's Motion or Def.'s Mot.) filed September 18, 2009, Docket Number (Dkt. No.) 70; Tribes' Response to United States' Motion for Judgment on the Pleadings as to Claim II of Oil and Gas Phase Two (plaintiffs' Response or Pls.' Resp.) filed October 29, 2009, Dkt. No. 74; and Defendant's Reply in Support of Defendant's Motion for Judgment on the Pleadings as to Claim II for Oil and Gas Phase Two (Def.'s Reply) filed December 18, 2009, Dkt. No. 86. Also before the court are the Tribes' Motion for Summary Judgment Against the United States on Liability for Illegal Conversion of Leases (plaintiffs' Motion or Pls.' Mot.) filed October 29, 2009, Dkt. No. 75; Defendant's Opposition to Tribes' Motion for Summary Judgment for Liability for Illegal Conversion of Leases filed January 22, 2010, Dkt. No. 87; Tribes' Reply to United States' Opposition to Tribes' Motion for Summary Judgment on Claim II of Oil and Gas Phase Two filed on February 19, 2010, Dkt. No. 90; and Tribes' Surreply to United States' Motion for Judgment on the Pleadings as to Claim II of Oil and Gas Phase Two (plaintiffs' Surreply or Pls.' Surreply) filed February 19, 2010, Dkt. No. 91. In this opinion, the Shoshone Indian Tribe of the Wind River Reservation, Wyoming (the Shoshone) and the Arapaho Indian Tribe of the Wind River Reservation, Wyoming (the Arapaho) are referred to collectively as plaintiffs or the Tribes, and the United States is also referred to as defendant or the government. For the reasons stated below, defendant's Motion is GRANTED and plaintiffs' Motion is MOOT.

The parties and the court are currently addressing Claim II of the Gas Phase Two portion of this litigation. *See* Tribes' Statement Identifying Oil and Gas Phase Two Issues (plaintiffs' Memorandum or Pls.' Mem.) filed January 13, 2006, Dkt. No. 20; *see also* Order of June 6, 2005, Dkt. No. 12. Plaintiffs' Claim II alleges that seven oil and gas leases were allegedly unlawfully converted from Act of August 21, 1916 (1916 Act) leases, Pub.L. No. 64–218, 39 Stat. 519 (1916), to Indian Mineral Leasing Act (1938 Act) leases, Pub.L. No. 75–506, 52 Stat. 347 (1938) (codified at 25 U.S.C. §§ 396a–396g (2006)). Pls.' Mem. 10–11. Plaintiffs claim damages based on the theory that they would have obtained better royalty and renewal terms if the leases had remained 1916 Act leases instead of being converted to 1938 Act Leases. *Id.* Defendant argues that plaintiffs' claim is time-barred by 28 U.S.C. § 2501 (2006),[1] which bars a suit against the United States unless it is filed "within six years after such claim first accrues." Def.'s Mot. 1. Plaintiffs maintain that the lease conversions took place "between the early 1940[.]s and the mid 1950[ ]s." Pls.' Mem. 11. Defendant argues that plaintiffs' claim therefore first accrued between the early 1940s and the mid 1950s "because the 'conversions' occurred pursuant to public law and the execution of lease instruments of which [p]laintiffs had actual, contemporaneous, and first-hand knowledge." Def.'s Mot. 2. Pursuant to defendant's argument, plaintiffs' complaint— filed in 1979—was filed more than six years after Claim II accrued and therefore should be dismissed as time-barred. *Id.*

---

1. This provision is unchanged from the version of 28 U.S.C. § 2501 in effect when these consolidated cases were filed in 1979. *See* Pub.L. No. 83–779, 68 Stat. 1226, 1246 (1954).

## I. Background

The Shoshone and the Arapaho each filed actions in this court's predecessor, the United States Claims Court, on October 10, 1979. The actions were subsequently consolidated. *See* Dkt. No. 1, Dkt. 79–458; Dkt. No. 1, Dkt. 79–459 (consolidated Nov. 8, 1979 as Dkt. No. 79–458). Plaintiffs amended their petitions by leave of court on March 28, 2006. Dkt. Nos. 22–24, Dkt. 79–4582. The facts for this phase of the case, Oil and Gas Phase Two (Claim II), were developed jointly "in lieu of an accounting by the [government]." Pls.' Mot. 4.[2] In 2007, the parties shared documents including "leases, letters, and similar materials [that] have been supplemented by additional discovery." *Id.* Also in 2007, the parties shared expert reports that discussed, inter alia, Claim II and damage calculations. *Id.* All other aspects of the case have been resolved. *See, e.g., Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States (Shoshone I),* 51 Fed.Cl. 60 (2001); *Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States (Shoshone II),* 364 F.3d 1339 (2004).

The Shoshone and the Arapaho share an undivided interest in the Wind River Indian Reservation (Wind River Reservation or reservation) in Wyoming. *Shoshone I,* 51 Fed. Cl. at 61. The Shoshone originally occupied approximately 44,672,000 acres in Wyoming, Colorado, Utah and Idaho. *Shoshone II,* 364 F.3d at 1342. In 1868, the Shoshone signed a treaty with the United States (the Treaty of 1868) and agreed to relinquish their lands and move onto a reservation established for their benefit. *Id.* The Treaty of 1868 provided that the reservation would be:

> set apart for the absolute and undisturbed use and occupation of the Shoshone Indians herein named, . . . and henceforth they will and do hereby relinquish all title, claims, or rights in and to any portion of the territory of the United States, except

such as is embraced within the limits aforesaid.

*Id.* (emphasis omitted).

On March 3, 1905 Congress ratified an agreement between the United States and plaintiffs in which plaintiffs ceded, granted and relinquished to the United States all of their right, title and interest in approximately · 1,480,000 acres of the Wind River Reservation. Pls.' Mem. 8–9; *see* Pub.L. No. 58–185, 33 Stat. 1016, Art. I (1905). The ceded lands were to be disposed of by the United States under the provisions of the homestead, town-site, coal, and mineral land laws or by sale for cash—with proceeds to be paid to plaintiffs. 33 Stat. 1016, Art. II. The United States agreed to act as trustee for the plaintiffs in that it would dispose of the ceded lands and deliver the proceeds to the Tribes. *Id.* at Art. IX. As alleged in plaintiff's Memorandum, "Around 1910, it became apparent that much of the 1904 ceded land was potentially valuable for oil and gas." Pls.' Mem. 9. After the potential value of the 1904 ceded land became apparent, Congress enacted the 1916 Act, which authorized "the Secretary of the Interior to lease the 'ceded' lands [of the Wind River Reservation] for oil and gas development." *Id.;* 1916 Act. The proceeds of the leases were to be "applied to the use and benefit" of the Tribes. *Id.* (internal quotation marks omitted). The 1916 Act leases provide, in pertinent part, that: (1) leases are for a period of twenty years; (2) leases can be renewed for successive periods of ten years; and (3) the minimum royalty is 10 percent. *Id.* at 10; 1916 Act.

The seven leases[3] at issue in Claim II were entered into pursuant to the 1916 Act. Pls.' Mem. 10–11. In 1938, Congress enacted the 1938 Act. As applied to the facts of this case, the material terms of a 1938 Act lease are: (1) leases are for a "term[ ] not to exceed ten years and as long thereafter as minerals are produced in paying quantities," 25 U.S.C. § 396a; and (2) royalty terms are

---

**2.** Unless the context within which a citation appears indicates the existence of a dispute, facts cited to the filings of only one of the parties do not appear to be in dispute.

**3.** The parties' experts originally disagreed about which 1916 Act leases were "converted." Plain-

tiffs' Motion for Summary Judgment (Pls.' Mot.) 4, Docket Number (Dkt. No.) 75. However, the parties later agreed that the seven leased parcels converted to 1938 Act leases were: SBF0001, SBF0004, MSF002, MSF004, MSF006, MSF0007, and MSF008. *Id.*

subject to the rules and regulations promulgated by the Secretary of the Interior, *see* 25 U.S.C. § 396d. The 1938 Act requires "authority of the tribal council or other authorized spokesperson for such Indians" to enter into a lease. 28 U.S.C. § 396a. The 1938 Act also provides that it shall not apply to "the ceded lands of the Shoshone Reservation in Wyoming." 25 U.S.C. § 396f.

On July 27, 1939, Congress enacted a land restoration act in aid of returning tribal lands to plaintiffs, the Act of July 27, 1939 (1939 Act), Pub.L. No. 76–238, 53 Stat. 1128 (1939). The 1939 Act provided:

> [T]he Secretary of the Interior is hereby directed to restore to tribal ownership all undisposed-of surplus or ceded lands within the land use districts which are not at present under lease or permit to non-Indians; and, further, to restore to tribal ownership the balance of said lands progressively as and when the non-Indian owned lands within a given land use district are acquired by the Government for Indian use pursuant to the provisions of this act.

*Id.* at § 5. On May 17, 1940 and August 10, 1944, the Secretary of the Interior, pursuant to the 1939 Act, "restored [certain ceded lands] to tribal ownership for the use and benefit of the Shoshone–Arapaho Tribes[4] of the Indians of the Wind River Reservation, Wyoming." 5 Fed.Reg. 1805–06 (1940); 9 Fed.Reg. 9749–50 (1944) (the Restoration Orders) (footnote added). The Secretary also "added" the lands subject to the Restoration Orders to "the existing Wind River Reservation, subject to any valid existing rights." 5 Fed.Reg.1906 (1940), 9 Fed.Reg. 1754 (1944). The surfaces of all seven leases at issue in Claim II were restored to the reservation by these two Restoration Orders. *See* Def.'s Mot. 4.

The government replaced the seven 1916 Act leases at issue in Claim II with 1938 Act leases. Pls.' Mem. 10–11. These conversions allegedly occurred "between the early 1940[ ]s and the mid 1950[ ]s." *Id.* at 11. All of the 1938 Act leases were, as required by the 1938 Act, signed by plaintiffs. *See* Def.'s Mot., Exhibit (Ex.) 1 (signed copy of Lease I–96–Ind–7736). Plaintiffs maintain that the signatures do not indicate an understanding of the content of the 1938 Act leases because the plaintiffs were misled by government representatives, who provided incomplete and possibly inaccurate information about the fiscal impact of the conversion to 1938 leases. Pls.' Resp. 5–6, 9. Defendant points out that the 1938 Act leases were "requested" by tribal resolution of the Tribes' Business Council. Def.'s Mot., Ex. 2 (Resolution No. 152) (requesting the Commissioner of Indian Affairs to convert the two Steamboat Butte leases to 1938 Act leases); Def.'s Mot., Ex. 9 (Resolution No. 153) (requesting that the five Maverick Springs leases be converted to 1938 Act leases). Plaintiffs contest the use of the term "requested" and contend that the "conversions were requested by the oil companies" not plaintiffs. Pls.' Resp. 11, n. 13. Defendant argues that plaintiffs' Claim II first accrued more than six years prior to the filing of the complaint and therefore is barred by 28 U.S.C. § 2501. Def.'s Mot. 2. Plaintiffs respond that "Claim II is timely under 'applicable rules' which defer accrual of the Tribes' claim for [statute of] limitations purposes." Pls.' Resp. 2. Specifically, plaintiffs argues that Claim II falls squarely under the Consolidated Appropriations Act of 2005 (Appropriations Act), Pub.L. No. 108–447, 118 Stat. 2809, which defers accrual of certain breaches of Indian trusts. *See* Pls.' Resp. 3–4 (citing *Shoshone II*, 364 F.3d at 1344, 1348–51). After addressing the standard of review in Part II.A the court addresses defendant's motion to dismiss under 28 U.S.C. § 2501 in Part II.B, the parties' arguments under general rules of claim accrual in Part II.C, and plaintiffs' claim

---

4. The Wind River Reservation, Wyoming (Wind River Reservation) was originally reserved by treaty for the sole occupation of the Shoshone. *Shoshone Tribe of Indians v. United States*, 299 U.S. 476, 485, 57 S.Ct. 244, 81 L.Ed. 360 (1937) (referencing 15 Stat. 673 (Treaty of July 3, 1868)). However, in March, 1878 the government brought a band of Northern Arapaho Indi-

ans to live with the Shoshone on the Wind River Reservation without the Shoshone's consent. *Id.* at 487, 57 S.Ct. 244. The Supreme Court held that the Shoshone Tribe was entitled to damages plus interest stemming from the government's unlawful placement of the Arapaho on the Wind River Reservation in 1878. *Id.* at 492–97, 57 S.Ct. 244.

under the special provisions of the Appropriations Act in Part II.D.

## II. Discussion

### A. Standard of Review

#### 1. RCFC 12(c)

Rule 12(c) of the Rules of the Court of Federal Claims (RCFC) permits a party to seek judgment based on a complainant's pleadings. RCFC 12(c). The rule states: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." *Id.* "A motion for judgment on the pleadings should be denied unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of his claim." *Branning v. United States,* 215 Ct.Cl. 949, 950 (1977) (discussing a predecessor rule to RCFC 12(c)). "[R]egardless of whether the trial court is convinced that the plaintiff is unlikely to prevail at trial, the court should only grant a defendant's motion for judgment on the pleadings if the defendant is clearly entitled to judgment on the basis of the facts as the plaintiff has presented them." *Owen v. United States,* 851 F.2d 1404, 1407 (Fed.Cir.1988). "[E]ach of the well-pled allegations in the complaint[ ] is assumed to be correct, and the court must indulge all reasonable inferences in favor of the plaintiffs." *Atlas Corp. v. United States,* 895 F.2d 745, 749 (Fed.Cir. 1990). The court does not accept, however, "assertions in the pleadings that amount to legal conclusions." *J.M. Huber Corp. v. United States,* 27 Fed.Cl. 659, 661 (1993).

#### 2. RCFC 12(b)(1)

A party may assert "lack of subject-matter jurisdiction" as a defense. RCFC 12(b)(1). A jurisdictional motion to dismiss may only be filed "before pleading if a responsive pleading is allowed." RCFC 12(b). In this case, defendant has already filed an answer, *see* Dkt. Nos. 13–14, Dkt. 79–458, and therefore has filed a motion for judgment on the pleadings, Def.'s Mot. 5, n. 3. Although subject-matter jurisdiction is usually challenged by a motion to dismiss for lack of subject matter jurisdiction, the issue can also be raised on a motion for judgment on the pleadings. *See id.* at 5.

The court is generally "'obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor'" when considering a motion under RCFC 12(b)(1) to dismiss for lack of subject matter jurisdiction. *FFTF Restoration Co. v. United States (FFTF Restoration),* 86 Fed.Cl. 226, 235 (2009) (quoting *Henke v. United States,* 60 F.3d 795, 797 (Fed.Cir. 1995)); *Int'l Mgmt. Servs. v. United States,* 80 Fed.Cl. 1, 4 (2007). However, only uncontroverted factual allegations are accepted as true for purposes of resolving the motion. *See Williams v. United States,* 71 Fed.Cl. 194, 197 (2006). In evaluating a motion under 12(b)(1), "the court 'may find it necessary to inquire into jurisdictional facts that are disputed.'" *FFTF Restoration,* 86 Fed.Cl. at 235 (quoting *Rocovich v. United States,* 933 F.2d 991, 993 (Fed.Cir.1991)). If the court does so, the plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. *McNutt v. Gen. Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *McNabb v. United States,* 54 Fed.Cl. 759, 763 (2002) ("If a defendant or the court challenges jurisdiction[,] … the plaintiff cannot rely merely on allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction."). RCFC 12(h)(3) requires that the court dismiss a case if the court determines "at any time that it lacks subject-matter jurisdiction." RCFC 12(h)(3); *Int'l Mgmt. Servs.,* 80 Fed.Cl. at 4.

### B. Whether Plaintiffs' Claim II is Barred by 28 U.S.C. § 2501

The issue before this court is whether plaintiffs' suit, filed in 1979, was timely under 28 U.S.C. § 2501. The statute of limitations provision of 28 U.S.C. § 2501 limits the government's waiver of sovereign immunity for every claim within the jurisdiction of the Court of Federal Claims. *Soriano v. United States,* 352 U.S. 270, 273, 77 S.Ct. 269, 1 L.Ed.2d 306 (1957); *Hart v. United States,* 910 F.2d 815, 817 (Fed.Cir.1990). Statutes that "defer the accrual of a cause of action,

or otherwise affect the time during which a claimant may sue the Government also are considered a waiver of sovereign immunity." *Shoshone II*, 364 F.3d at 1346 (citing *Martinez v. United States*, 333 F.3d 1295, 1316–17 (Fed.Cir.2003) (noting that exceptions to statutes of limitations on suits against the Government are not to be implied)). The court in *Shoshone II* explained that such "statutes must be construed strictly and must clearly express the intent of Congress to permit a suit against the Government." *Id.* (citing *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999) ("We have frequently held, however, that a waiver of sovereign immunity is to be strictly construed, in terms of its scope, in favor of the sovereign. Such a waiver must also be 'unequivocally expressed' in the statutory text." (internal citations omitted))).

 As a general rule, claims by Indian Tribes are subject to the six-year statute of limitations applicable to actions in this court under 28 U.S.C. § 2501. *Hopland Band of Pomo Indians v. United States (Hopland)*, 855 F.2d 1573, 1576 (Fed.Cir.1988) ("[S]tatutes of limitations are to be applied against the claims of Indian Tribes in the same manner as against any other litigants seeking legal redress or relief from the government."). The statute of limitations begins to run when the "claim first accrues." 28 U.S.C. § 2501. A claim against the government first accrues "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Hopland*, 855 F.2d at 1577 (emphasis omitted). In order for the accrual standard set forth in *Hopland* to be met, damages must have been suffered. *Rosebud Sioux Tribe v. United States*, 75 Fed.Cl. 15, 24 (2007) ("It is too well established to require citation of authority that a claim does not accrue until the claimant has suffered damages." (internal quotation marks omitted)).

 A breach of trust claim accrues when the trustee "repudiates the trust and the beneficiary has knowledge of that repudiation." *Shoshone II*, 364 F.3d at 1348. *Shoshone II* defined "knowledge of repudiation"

as the time when the beneficiary is "plac[ed] on notice that a breach of trust has occurred." *Id.* However, a party need not have actual knowledge of the events fixing liability in order for the claim to accrue. As this court stated in *Otay Mesa Property L.P. v. United States (Otay Mesa)*, "[w]here the Government's actions are open and notorious, the plaintiff is on inquiry notice, and the statute of limitations begins to run." 86 Fed.Cl. 774, 786 (2009). The *Otay Mesa* court provided the following support for its conclusion that the statute of limitations may begin to run when a plaintiff has inquiry notice:

> *Ingrum v. United States*, 560 F.3d 1311, 1317 (Fed.Cir.2009) (holding that the Government's excavation of fill material from the plaintiff's property to repair a road over which it had a right of entry put the plaintiff on inquiry notice of the alleged taking, even though the plaintiff did not learn of the borrow pit until later, because the pit was in plain sight and clearly visible from the road); *Coastal Petroleum Co. v. United States*, 228 Ct.Cl. 864, 864 (1981) (finding the Government's actions open and notorious where the construction project was widely reported in the state news media); *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 408–09 (1994) (concluding that the Government's bombing exercises on the plaintiff's property placed the plaintiff on inquiry notice of the unexploded objects on his property).

*Id.* The "on notice" standard applied in *Otay Mesa* is no different than the objective standard commonly applied to the "accrual suspension rule," which states that the accrual of a claim against the United States is suspended "until the claimant knew or should have known that the claim existed." *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir.2008).

Defendant argues that plaintiffs "knew or should have known that [d]efendant allegedly illegally converted the leases" when plaintiffs signed the converted leases. Def.'s Mot. 7–8. Defendant argues, in the alternative, that plaintiffs were aware of, or at least had the responsibility to be aware of, the requirements of the 1916 Act and the 1938 Act when

they were enacted. *Id.* at 8 (citing *Harris Corp. v. Ericsson, Inc.,* 417 F.3d 1241, 1263 (Fed.Cir.2005) (citing *Pittsburgh & Lake Angeline Iron. Co. v. Cleveland Iron Min. Co.,* 178 U.S. 270, 278, 20 S.Ct. 931, 44 L.Ed. 1065 (1900))). Defendant specifically points to three different events that, it contends, did or should have provided plaintiffs with knowledge that defendant had allegedly illegally converted the leases: when the leaseholders presented " '[a] written request to the Joint Business Council[5] to convert its ceded leases;' " when the Tribes formally resolved that " 'new leases [would] be prepared ... covering the restored tribal lands ... as provided for in the Act of May 11, 1938;' " and when the Tribes requested that "the Commissioner of Indian Affairs 'furnish appropriate instructions and necessary form of stipulation to convert the ... leases' to 1938 Act leases." Def.'s Mot. 8 (quoting Def.'s Mot., Ex. 2 (Resolution No. 152); Def.'s Mot., Ex. 9 (Resolution No. 153). Defendant also contends that plaintiffs learned of the conversions when they approved and signed the 1938 Act leases. *Id.;* Def.'s Exhibits (Exs.) 1 (lease signed Feb. 11, 1949), 3 (lease signed Feb. 11, 1949), 4 (lease signed Aug. 10, 1949), 5 (lease signed Aug. 10, 1949), 6 (lease signed Aug. 10, 1949), 7 (lease signed July 21, 1950) and 8 (lease signed Aug. 10, 1949). Defendant argues that "no later than the 'mid 1950[ ]s' [p]laintiffs had actual knowledge of the new leases" and, consequently, the contents of their terms as 1938 Act leases. Def.'s Mot. 8.

■ Defendant contends that plaintiffs had actual or imputed knowledge "no later than the 'mid 1950[ ]s' " of the government's alleged illegal conversions because "applicable leasing laws and regulations (including the 1916 Act and the 1938 Act), "were available to them". *Id.* Defendant contends that plaintiffs were therefore "aware of all information necessary to be 'on notice' of the alleged breach of trust." *Id.* Plaintiffs maintain that the Tribes were "beneficiaries of an extensive and complex portfolio of leases," making plaintiffs' losses "undetectable and unknown" until after Claim II was filed. Pls.' Resp. 8. Plaintiffs do not provide any legal authority that supports the argument that when a Tribe's leasing plan is complex, that circumstance creates a situation in which that Tribe is excused from having actual knowledge of the content of the lease or leases it approved and executed. The court finds plaintiffs' proposed conclusion unsupported by law. Plaintiffs have failed to support the argument that they lacked knowledge of the lease conversions until after Claim II was filed.

### C. Whether Accrual of Claim II Was Suspended Under General Rules for Suspension of Claim Accrual

#### 1. Claim II Was Not Inherently Unknowable Prior to 1979

Plaintiffs also argue that Claim II did not accrue until after the claim was filed because the Tribes could not "reasonably have been aware" of their right to bring a claim because "the [g]overnment as trustee affirmatively misled and misinformed the Tribes about the legality and effect of the 'conversions.' " Pls.' Resp. 5. In order for the statute of limitations to be suspended, the plaintiffs must show: "(1) that plaintiff[s'] injury was 'inherently unknowable' at the time of accrual; (2) that defendant concealed its action with the result that plaintiffs [were] unaware of its existence; or (3) that the plaintiff[s] relied on a misrepresentation by the defendant." *Cherokee Nation of Okla. v. United States,* 26 Cl.Ct. 798, 801 (1992).

Plaintiffs argument that the fact that the leases were converted from 1916 Act to 1936 Act leases was "inherently unknowable" is based on the role of the United States as trustee, the failure of the United States to provide an accounting to the Tribes, and the concept that the losses under the leases were "much less obvious than the losses in other

---

5. Although a specific definition is not provided in the pleadings, the Joint Business Council appears to the court to be a body consisting of representatives of both the government and the Tribes. *See* Defendant's Motion for Judgment on the Pleadings (Def.'s Mot.) 8; Tribes' Response to United States' Motion for Judgment on the Pleadings as to Claim II of Oil and Gas Phase Two (Pls.' Resp.) 10–11. Decisions regarding tribal matters, including decisions concerning the execution of leases, were made at Joint Business Council meetings. *See* Pls.' Resp. 11.

tribal cases against the [g]overnment as trustee." Pls.' Resp. 9–10. As the *Young* court held, a claim is suspended only "until the claimant knew or should have known that the claim existed." 529 F.3d at 1384. The *Young* court also stated that, in order to demonstrate entitlement to a suspension, a plaintiff "must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was inherently unknowable at the accrual date." *Id.* (internal quotation marks omitted). Plaintiffs argue that the government's duty to disclose is elevated in breach of trust cases pursuant to *Shoshone II* because "beneficiaries of [a] trust are permitted to rely on the good faith and expertise of their trustees," and therefore beneficiaries, such as plaintiffs, "are under a lesser duty to discover malfeasance relating to their trust assets." Pls.' Resp. 8 (quoting *Shoshone II*, 364 F.3d at 1339, 1347–48). Plaintiffs interpret the quoted statement by the court in *Shoshone II* to mean that "beneficiaries are under a lesser duty to discover their claims." Pls.' Resp. 9 (emphasis omitted).

The Supreme Court in *United States v. Mitchell*, 463 U.S. 206, 227, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983), held that "[a] trusteeship would mean little if the beneficiaries were required to supervise the day-to-day management of their estate by their trustee or else be precluded from recovery for mismanagement." While trust beneficiaries have been allowed greater latitude to discover their claims, tribal plaintiffs are generally not entitled to a different statute of limitations than are other claimants. *See Shoshone II*, 364 F.3d at 1346–48. Defendant argues that, in this case, plaintiffs were aware of the differing provisions of the 1916 Act leases and the 1938 Act leases at least in part because plaintiffs are presumed to know the law as a

general rule. Def.'s Reply 15 (citing *Harris Corp.*, 417 F.3d at 1263). In this case, defendant asserts that plaintiffs had full access to those public laws as well as to the text of the leases they signed, which included the "converted" 1938 Act lease provisions. *Id.* Further, in 1959, twenty years before Claim II was filed, plaintiffs' counsel displayed an understanding of the different leasing provisions of the two acts. *Id.;* Def.'s Reply, Supplemental (Supp.) Ex. 15 (1959 letter), Dkt. No. 86.[6]

On February 17, 1959, plaintiffs' counsel, Mr. Sonosky, wrote a letter to the Department of the Interior in which he questioned whether defendant was acting in plaintiffs' best interest with respect to the 1916 Act leases. Supp. Ex. 15 (1959 Letter). Plaintiffs, however, insist that they are entitled to attribute their failure to bring Claim II earlier to their lack of knowledge of the lease conversions by the government. Pls.' Resp. 6. The Tribes point to a 1983 letter[7] from the Tribes' attorneys to a representative of the Gulf Oil Company which, plaintiffs assert, was the first time the Tribes made the Claim II allegation of illegal conversion. *Id.;* Pls.' Resp., Ex. 44, Dkt. No. 74. Plaintiffs claim that "if the Tribes had been aware of Claim II prior to filing [the 1979 Tribal Petitions], the Tribes would have described it more thoroughly in those pleadings." Pls.' Resp. 6. The court finds that the 1959 letter clearly indicates that the Tribes' counsel was aware of the differences between the 1916 Act and the 1938 Act as they applied to the Tribes:

> The 1916 Act was among the first statutes authorizing oil and gas leasing of Indian lands. Subsequent experience has indicated the wisdom of shorter primary terms with extensions contingent upon the production of oil and gas in paying quantities. Thus, the policy of Congress and of the

---

**6.** Defendant's cites Exhibit 12 to support this proposition. However, the letter from the Law Offices of Marvin J. Sonosky 3 dated February 17, 1959, is attached as Exhibit 15. Defendant's Reply (Def.'s Reply), Supplemental (Supp.) Ex. 15 (1959 Letter), Dkt. No. 86.

**7.** Plaintiffs assert that, at the time the 1983 letter was written, the Tribes had not received an accounting showing how much had been collected on their behalf for the seven parcels on the Wind

River Reservation. Pls.' Resp. 6–7 (citing *Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States (Shoshone II)*, 364 F.3d 1339, 1347 (Fed.Cir.2004); *Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States (Shoshone I)*, 51 Fed.Cl. 60, 63 (2001) (finding that the Tribes had not received an accounting by the government of trust funds or mineral income)).

Department [of the Interior] is expressed in the Indian Leasing Act of 1938 (25 U.S.C. [§§ ] 396[a–396g] ) which requires that oil and gas be executed by the Tribes and provides for terms "not to exceed ten years" without extension except by production (25 U.S.C. [§ ] 396a).... It would seem appropriate, so far as possible, that the Secretary by regulation should bring the 1916 Act leases within the policy governing all other Indian oil and gas leases. Supp. Ex. 15 (1959 Letter) 2–3. While it is unclear from the content of the letter whether plaintiffs' attorneys understood exactly when and how the 1916 Act leases were converted to 1938 Act leases, the letter demonstrates a noticeable level of concern as to the management of the leases and whether the government was making decisions in line with its duty as a trustee "to make as good a bargain for the [Tribes] as a prudent and informed oil and gas operator would make for himself." Supp. Ex. 15 (1959 Letter) 2. This letter undermines plaintiffs' contentions that they neither knew of the conversions nor had reason to question the government's actions regarding the leases. *See Young*, 529 F.3d at 1384. Plaintiffs attorneys' decision not to follow up on the concerns expressed in the letter do not automatically extend the statute of limitations. *See Brown v. United States*, 195 F.3d 1334, 1338 (Fed.Cir.1999) (in a case charging that the government violated its fiduciary duty to plaintiff-allottees because it under-reported gross receipts, imputing to plaintiffs the "capacity and sophistication" of a non-party allottee, "who was a fellow lessor [and] fellow member of the Tribe").

### 2. Fraud, Concealment or Misrepresentation by the Government [8]

Plaintiffs also argue that the statute of limitations did not begin to run because the government concealed information of which the plaintiff was unaware. Pls.' Resp. 10–11; *see Ingrum v. United States*, 560 F.3d 1311, 1315 (Fed.Cir.2009) (stating that accrual of

the statute of limitations will be suspended if plaintiff shows "that defendant has concealed its acts with the result that plaintiff was unaware of their existence"); *Young*, 529 F.3d at 1384 (holding that the plaintiff had "not established a basis for tolling ... because he did not show that any relevant facts were concealed or that he was in any way misled by the government into delaying more than six years before filing [his] complaint"). Plaintiffs allege that the government concealed information from and affirmatively misled the Tribes by informing them that "conversion" of the leases was both legal and in their interest. Pls.' Resp. 10. Plaintiffs also allege that the government misstated the economic impact of the lease conversions to the Tribes when it indicated that the economic impact for the Tribes would be the same under both the 1916 Act leases and the 1938 Act leases. *Id.* at 10–12. Plaintiffs allege that, during Joint Business Council meetings, the government affirmatively misstated information when it obtained the Joint Business Council's approval of the proposed leased conversions. *Id.* at 11–12. At a meeting of the Joint Business Council at which the lease conversions were discussed, the government's representative stated that the conversion of the leases would bring about the following changes:

> The only two real differences in the two leases is that [the 1916 Act] lease is a lease between the oil company and the Secretary of the Interior, and the lease was made for a limited term, with the right of renewal. The [1938 Act] lease form on tribal land is between the Tribes and the oil company, and runs for ten years and as long thereafter as oil and gas are produced. It has the same rent and the same rate of royalty.

Pls.' Resp. 12 (quoting Pls.' Resp., Ex. 9 at 63 (Minutes of Joint Business Council Meeting (Jan. 10, 1949))) (emphasis omitted). Plaintiffs assert that the government provided misinformation in this statement because "economic returns from 'converted' and 'unconverted' leases would [have been] very dif-

---

8. For purposes of this discussion, the court considers the second element of accrual suspension as articulated in *Cherokee Nation of Oklahoma v. United States*, 26 Cl.Ct. 798, 801 (1992), "concealment," with the third element, "reli[ance] on

[the] misrepresentation," together because, in this case, plaintiffs' claims of concealment of information and reliance on the incomplete information are not readily separable.

ferent in renewal periods," and "the oil and gas companies stood to benefit from the 'conversions.'" *Id.* Plaintiffs also claim that the Tribes were misled because the government did not disclose what they "would be giving up if the 10–year expirations and preferential renewal requirements were lost." *Id.* In response, defendant claims that plaintiffs cannot argue that defendant concealed the conversions because plaintiffs were parties to the 1938 Act Leases, plaintiffs requested that the leases be converted at their Joint Business Council Meeting and "plaintiffs' counsel demanded that [d]efendant not renew any 1916 Act leases without express consent." Def.'s Reply 15.

In order for a beneficiary to consent to a transaction, "there must be full disclosure of all material facts and legal rights involved." Pls.' Resp. 13, n. 24 (citing George T. Bogert § 941 (6th ed.1987); Restatement (Second) Trusts § 216(2)(b) (1959)). In this case, it is certainly possible that the government did not provide adequate information to the Tribes at the time that the conversions occurred. However, even if the statute of limitations were tolled by concealment, the statute will begin to run again once plaintiff is on inquiry that he has a potential claim. *Braude v. United States,* 218 Ct.Cl. 270, 585 F.2d 1049, 1052, 1054 (1978). Under trust law, there is a special relationship created between beneficiary and trustee. However, once the trust beneficiary learns of a suspected breach by the trustee, the beneficiary must take action within the period specified in the statute of limitations. In this case, issues relating to the Tribes' leases were the focus of plaintiffs' counsel, Mr. Sonosky, in his letter of February 17, 1959. *See* Supp. Ex. 15. (1959 Letter). In the 1959 letter, Mr. Sonosky indicates that plaintiffs "were shocked out of complacency" when they learned of efforts to extend a 1916 Act lease. *Id.* Further, in a memorandum from Mr. Sonosky to the Shoshone and Arapaho Business Council dated July 27, 1959, Mr. Sonosky recommended that the Tribes support legislation eliminating 1916 Act leas-

es in favor of 1938 Act leases. Def.'s Reply 13 (citing Supp. Ex. 17 at 3, ¶ 4). The memorandum also "recommended that, until legislation is obtained, the regulations should be amended to require tribal consent to any new 1916 Act leases." Supp. Ex. 17 at 3, ¶ 5. The court finds that Mr. Sonosky's February 17, 1959 letter evidences that, at the very least, that the Tribes had constructive knowledge of what they now characterize as the illegal conversion of the leases.

Mr. Sonosky's letter evidences the Tribes' heightened level of concern about leasing. That heightened level of concern should have led to a broader inquiry as to the status of the leases and, if appropriate, to legal action. *See Mitchell v. United States,* 10 Cl.Ct. 63, 68 (1986) (" '[W]hatever is notice enough to excite attention and put the party on his guard and call for inquiry, is [also] notice of everything to which such inquiry might have led.' ") (quoting *Wood v. Carpenter,* 101 U.S. (11 Otto) 135, 141, 25 L.Ed. 807 (1879)). In and after 1959, plaintiffs had knowledge that should have prompted an inquiry regarding the lease conversions. *See Cherokee Nation of Okla.,* 26 Cl.Ct. at 802–03 (holding that the statute of limitations was not tolled until defendant filed its motion to dismiss because plaintiff was on constructive notice of the trespass and "had the opportunity to discover the truth" and "plaintiff chose to do nothing").

Neither general rules that have operated to defer trust claims nor other general rules of suspension for claim accrual has been shown to apply to plaintiffs' Claim II.

### D. Whether the Appropriations Act Applies to Plaintiffs' Claims

In addition to the general statute of limitations for claims in this court, 28 U.S.C. § 2501, Congress has enacted within a series of appropriations acts covering the United States Department of the Interior provisions which suspend accrual of the statute of limitations for certain tribal trust claims, including the following: [9]

9. An earlier version of the Appropriations Act was first adopted in 1990 and has been adopted each year thereafter, with minor changes in 1991

and 1993. Pub.L. No. 101–512, 104 Stat.1915, 1930 (1990) originally provided:

[N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim ... concerning losses to or mismanagement of trust funds, until the affected tribe ... has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Appropriations Act, 118 Stat. at 3060–61. Plaintiffs argue that the Appropriations Act applies to this case because the government "never provided the Tribes an accounting [and therefore the] limitations periods for claims concerning 'losses to' the Tribes' 'trust funds' ha[s] not yet commenced to run." Pls.' Resp. 14. Defendant asserts that the Appropriations Act does not apply to this case because, in order for claims to fall within the parameters of the Appropriations Act, a claim must be based on the " 'mismanagement of trust funds.' " Def.'s Mot. 9 (quoting *Shoshone II*, 364 F.3d at 1350). If defendant's view, expressed in the language just quoted, is that the Appropriations Act covers only mismanagement of trust funds, that view is at odds with both the text of the Appropriations Act and its interpretation by the United States Court of Appeals for the Federal Circuit. *See id.* (quoting *Shoshone II*, 364 F.3d at 1350) (characterizing the Federal Circuit's opinion in *Shoshone II* as establishing that the Appropriations Act "only" reaches " 'mismanagement of trust funds' "). However, defendant also recognizes and argues that the Appropriations Act covers both losses to trust funds and mismanagement of trust funds. *Id.* (quoting *Shoshone II*, 364 F.3d at 1350) (conceding that the Appropriations Act "may also apply to 'losses ... to trust funds' " resulting from the government's failure to collect payments under leases, deposit collected monies or assess penalties for late payment).

In *Shoshone II*, the Federal Circuit interpreted a predecessor to the Appropriations Act containing, in relevant part, identical language. The Appropriations Act applies to claims concerning "losses to *or* mismanagement of trust funds." 118 Stat. at 3060–61 (emphasis added). In particular, the Federal Circuit interpreted "losses to ... trust funds" to refer to "losses resulting from the [g]overnment's failure or delay in (1) collecting payments under the ... contracts, (2) depositing the collected monies into the Tribes' interest-bearing trust accounts, or (3) assessing penalties for late payment." 364 F.3d at 1350. According to the Federal Circuit, the Appropriations Act's application to "mismanagement of trust funds" is "separate and distinct from ... losses to ... trust funds." *Id.* (internal quotation marks omitted). The court clarified that "mismanagement of trust funds" involve "mismanagement of trust funds *once collected.*" *Id.* at 1350–51 (emphasis added). The Federal Circuit also concluded that the Appropriations Act does not cover mismanagement claims "involving trust assets," that is, the Act does not cover claims involving a "failure to obtain a maximum benefit" from an asset; rather, the Federal Circuit held, the Appropriations Act covers "losses resulting from the [g]overnment's failure to timely collect amounts due and owing to the Tribes under its ... contracts," *id.* at 1350.

▮ Defendant argues that none of the Federal Circuit's categories of "losses to ... trust funds" are at issue in Claim II. Def.'s Mot. 10 (internal quotation marks omitted) ("Plaintiffs have not alleged that [d]efendant failed or delayed in collecting payments due under the operative leases, failed to timely deposit royalties collected under these leases into [p]laintiffs' trust accounts, or failed to assess appropriate penalties for late payments under the[se] leases."). According to defendant, plaintiffs have claimed only that the lease " 'conversions were [allegedly] illegal,' " and that defendant has allegedly failed " 'to modify those terms to the detriment of the Tribes.' " Def.'s Mot. 10 (quoting Pls.'

[N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with the accounting of such funds[.]

The clause "from which the beneficiary can determine whether there has been a loss" was added to the end of the provision in 1991. Pub.L. No. 102–154, 105 Stat. 990, 1004 (1991). Congress added "including any claim in litigation pending on the date of this Act" in 1993. Pub.L. No. 103–138, 107 Stat. 1379, 1391 (1993).

Mem. 11). Defendant argues that "[s]uch claims are outside the ambit of the Appropriations Act," because plaintiffs' Claim II is based on the "alleged mismanagement of a trust *asset* as opposed to a trust *fund*." [10] *Id.* (citing *Shoshone II*, 364 F.3d at 1350).

Defendant's argument is based on its classification of the effect of defendant's alleged conversion of the 1916 Act leases to 1938 Act leases. *Id.* (noting that "the only [relevant] difference between the 1916 Act leases and the 1938 Act leases ... is ... that 1916 Act leases are subject to renewal every 10 years, while 1938 Act leases remain effective as long as minerals are produced in paying quantities" (internal citations omitted)). According to defendant, "[t]he hypothetical royalties that [p]laintiffs speculate, in hindsight, they would have obtained had the leases been renewable after a term of 10 years, ... are not set by statute and any differences in royalty rates would be consequential to [p]laintiffs' specific claim[:] allegedly unlawful conversion." *Id.* (internal quotation marks omitted). Defendant asserts that the 1916 Act leases and the 1938 Act leases "cover the

[trust] asset, not the amount collected and deposited pursuant to those leases, or any penalties assessed pursuant to those leases." *Id.* at 12.[11]

The Federal Circuit also addressed the requirement of the Appropriations Act that the government furnish an accounting of such funds " 'from which the beneficiary can determine whether there has been a loss.' " *Shoshone II*, 364 F.3d at 1344 (quoting an earlier version of the Appropriations Act, Pub.L. No. 108-7, 117 Stat. 11 (2003)). The court stated the "clear intent of the [Appropriations] Act is that the statute of limitations will not begin to run on a tribe's claims until an accounting is completed." *Id.* at 1347. The court therefore held "that claims falling within [the Act's] ambit shall not accrue ... until the claimant is provided with a meaningful accounting." *Id.* However, the requirement that the government provide an accounting applies only to claims that fall within the types of trust obligations to which the Appropriations Act applies: "losses to or

**10.** Defendant cites *Oenga v. United States*, 83 Fed.Cl. 594 (Fed.Cl.2008), to support its contention about the inapplicability of the Consolidated Appropriations Act of 2005 (Appropriations Act), Pub.L. No. 108-447, 118 Stat. 2809. At issue in *Oenga* was a 1989 lease, which was amended in 1994 and 1995, entered into by the *Oenga* plaintiffs and an oil company granting the oil company the right to produce oil on the plaintiffs' land. *Id.* at 596–97. The lease was approved by the Department of the Interior Bureau of Indian Affairs. *Id.* at 596. The plaintiffs claimed that the government, as trustee of the plaintiffs' lease with the oil company, failed to collect royalties on the oil and gas produced from the plaintiffs' land—as was permitted by applicable statutes and regulations—and also failed to collect fair annual rental from the lessee. *Id.* at 610–11. The government argued that "claim one accrued in 1989, when the lease was executed without any provisions for royalties, and claim two accrued in 1993 or 1997 at the latest, when the rental adjustments complained of were made." *Id.* at 609. The court analyzed the plaintiffs' claims as "pertain[ing] ... to the management of the [trust] asset, the leased allotment" and not as a trust fund. *Id.* at 611. Based on that analysis, the *Oenga* court concluded that the Appropriations Act did not apply to plaintiffs' claims. *Id.* at 613.

This court finds *Oenga* inapposite. In *Oenga*, the government failed to include legally required terms in plaintiffs' lease with the lessee oil company. That is, the government failed to incorpo-

rate royalty-collection terms as well as "fair annual rental" terms in the lease, both of which were required under law at the time.

It is the view of the court that a contract of a tribal trust beneficiary entered into under the guidance of its government trustee must incorporate the relevant law or be deemed to do so. When there is a regulatory or legislative framework that directs the interpretation of a lease, that framework should be considered part of the contract. *See generally Osage Tribe of Indians of Okla. v. United States*, 72 Fed.Cl. 629 (2006). To the extent that *Oenga* holds that the Federal Circuit interpreted the Appropriations Act as extending "only to cases where money was lost to the trust fund by virtue of the government's failure to collect the amount stipulated in a given contract or lease, as opposed to its failure to include the legally-required terms in the contract or lease to begin with," *Oenga*, 83 Fed.Cl. at 611, the court respectfully disagrees, *see also* Pls.' Resp. 16 (*"Shoshone [II]* is clear that violations of statutes and regulations are not to be so distinguished from violations of lease terms.").

**11.** Plaintiff counters that the "[g]overnment clearly failed to collect payments, whether the affected oil companies are trespassers or holders of rights under surviving 1916 Act leases." Plaintiffs' Reply 14. The court addresses plaintiffs' trespass claims below in Part II.E and plaintiffs' "expiration and 'relinquishment' " claims in Part II.F.

mismanagement of trust funds." *See id.* at 1348–49 (internal citations and emphasis omitted). The court agrees with defendant that plaintiffs' Claim II is more readily characterized as mismanagement of an asset, a matter explicitly excluded by the Federal Circuit from the Appropriations Act. *See id.* at 1350.

Moreover, the basis for plaintiffs' argument—that defendant failed to collect royalties under 1916 Act leases that were not actually in place—makes an "accounting" appear particularly unhelpful in this case. Plaintiffs' argument is that defendant failed to collect royalties under the 1916 Act because seven of its leases were improperly converted into 1938 Act leases. It is difficult to envision an accounting under a contract that was not in effect. There is simply no "contract" under which defendant has failed or delayed "in ... collecting payments." *Shoshone II,* 364 F.3d at 1350.

Plaintiffs have offered no argument or evidence that permits the court to conclude that the 1916 Act leases constitute, in effect, enforceable contracts. Plaintiffs do not claim that the government failed to collect or deposit rents or royalties under enforceable leases. Accordingly, plaintiffs' Claim II is not covered by the Appropriations Act and is therefore subject to analysis under the statute of limitations provisions of 28 U.S.C. § 2501. Because plaintiffs' Claim II accrued before October 10, 1973, six years prior to plaintiffs filing of their claims in this court, plaintiffs' claim is barred by the statute of limitations.

### E. Claim II is Neither a Trespass Claim nor a Continuing Trespass Claim

Plaintiffs also argue that Claim II is timely because the government has allowed continuous trespass on the seven parcels covered by the leases in question. Pls.' Resp. 16–17. Plaintiffs' trespass claim is based on a specific interpretation of the government's responsibility to keep trespassers off of the land covered by the seven leases. *Id.* at 17. Plaintiffs maintain that, because the leases were improperly converted, defendant facilitated a "continu[ing] trespass" by allowing oil and gas companies to extract minerals from the parcels without any valid leases. *Id.* (citing *Cherokee Nation of Okla.,* 21 Cl.Ct. at 576 ("In order to administer plaintiff's mineral estate and collect royalties, the government must remove trespassers who take oil or gas illegally.")). In support of their continuing trespass claim, plaintiffs attempt to draw a parallel between their circumstance and that of the plaintiff in *Oenga v. United States,* 83 Fed.Cl. 594, 617–18 (Fed.Cl.2008). Pls.' Resp. 15. The *Oenga* plaintiff "alleged that an oil company was in trespass by making use of the plaintiffs' land wholly outside the scope of the existing lease." *Id.* However, the trespass claim in *Oenga* was based on the extraction of oil from areas other than those explicitly stated in the lease itself. *Id.* ("[T]he scope of the [*Oenga*] lease did not encompass oil and gas development and production from areas outside Niakuk, [as indicated by] repeated references to the 'Niakuk Project' in the original lease ... [which] evidence[s] that ... oil would be produced from Niakuk only."). This case is distinguishable. In this case, defendants were not making use of plaintiffs' land outside the scope of particular leases. Other cases cited by plaintiffs in support of "hornbook oil and gas law that a developer extracting minerals from a parcel of land without any valid lease is committing trespass" differ substantially from this case. Pls.' Mot. 17. For example, plaintiffs attempt to draw a parallel between this case and cases in which unauthorized parties extracted minerals in violation of both operative and expired leases. *Id.* (citing *Guffey v. Smith,* 237 U.S. 101, 35 S.Ct. 526, 59 L.Ed. 856 (1915)) (awarding damages to lessor where another unauthorized producer drilled in good faith in the same parcel); *United States v. West,* 232 F.2d 694, 699 (9th Cir. 1956), cert. denied, 352 U.S. 834, 77 S.Ct. 51, 1 L.Ed.2d 53 (1956) (identifying as trespassers individuals who continued to occupy and us land for grazing after termination of a grazing license on the Fort Apache Indian Reservation). The court does not find the continuing trespass argument applicable to plaintiffs. The oil and gas operators who extracted minerals from the seven parcels in this case were doing so under the authority of lease agreements executed by the Tribes themselves.

Nor is plaintiffs' claim cognizable under the continuing claim doctrine, under which the statute of limitations would begin to run anew each time the government fails to act on behalf of the trustee. *Id.* at 18. To constitute a continuing claim, "the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." *Brown Park Estates–Fairfield Dev. Co. v. United States (Brown Park Estates)*, 127 F.3d 1449, 1456 (Fed.Cir.1997); *see also Central Pines Land Co. v. United States*, 61 Fed.Cl. 527, 537 (2004) ("[T]he continuing claim doctrine applies in cases involving a series of separate wrongful actions."). The *Brown Park Estates* plaintiffs alleged that the Department of Housing and Urban Development (HUD) had failed properly to set the maximum rent for low-income housing based on the fair market value of the rental property for the local area because it did not make required rental adjustments. 127 F.3d at 1453. In that case, the plaintiffs argued that HUD started from the wrong base when making rent adjustments during the six-year period prior to the filing of the suit. *Id.* at 1457–58. The *Brown Park Estates* plaintiffs argued that the "improper base [amount] . . . relates directly to, and is completely dependent on, whether HUD failed to make rent adjustments" during the six years prior to the filing of suit. *Id.* at 1458. Here, plaintiffs claim that "each extraction of oil and gas without a valid lease is a distinct trespass not dependent on when or how the initial trespasses began." Pls.' Resp. 19–20.

However, the Federal Circuit rejected the *Brown Park Estates* plaintiffs' continuing claim argument and held that the claims accrued at the time of HUD's earliest failure to make adjustments. 127 F.3d at 1457–59. *See Boling v. United States*, 220 F.3d 1365, 1373 (Fed.Cir.2000) ("The continuing claims doctrine . . . does not apply in cases where a single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental breach."). In this case, the leases were alleged to have been "illegally converted" from 1916 Act leases to 1938 Act leases in the late 1940s and early 1950s. Pls.' Mem. 11. Here, as in *Oenga,* the conversion itself is alleged to have "set off a 'series of deleterious effects' . . . but once each amendment was in place, the payments in later years did not give rise to independent damages," *Oenga,* 83 Fed.Cl. at 616 (quoting *Boling,* 220 F.3d at 1373), on the contrary, "the damages were directly tied to the terms of the earlier lease amendment," *id.* The continuing claim doctrine does not apply to plaintiffs' Claim II.

F. Survival of Expiration and "Relinquishment"

Plaintiffs also put forth, briefly, an argument based on the government's failure to collect amounts due under the 1916 Act leases "if they survived expiration and 'relinquishment.' "[12] Pls.' Resp. 20. The argument, as the court understands it, is premised on the view that the seven "converted" leases may have survived both expiration and "relinquishment" and therefore-based on the clause in the 1916 Act that establishes a periodic expiration with preferential renewal for all 1916 Act leases-the government remained obligated to provide a first right of renewal to the 1916 Act lessees every ten years, following the initial twenty-year term. *Id.* According to plaintiffs, because the government has failed to review the seven leases as they came up for renewal under the 1916 Act, "a new claim accrues against the [g]overnment on each renewal date." *Id.* (citing *Brown,* 195 F.3d at 1341). Plaintiffs conclude that all failures to renew the 1916 Act leases "on or after October 10, 1973[are] not timed-barred." *Id.* at 21. The court is aware of no authority that could support plaintiffs' argument and, absent such authority, it is the court's view

---

**12.** The specific definition of "relinquishment" plaintiffs wish to invoke is unclear. The court interprets the term, in the context of plaintiffs' argument, to mean that the 1916 Act leases were never retired or abandoned-with the result that their terms are still in effect today. *See Black's Law Dictionary* 1317 (8th ed.2004) (defining relinquishment as "[t]he abandonment of a right or thing").

that the 1916 Act leases did not "survive" expiration.

### III. Conclusion

Based on the foregoing, the court GRANTS defendant's Motion to Dismiss. Plaintiffs' Motion for Summary Judgment is MOOT. There being no further pending claims, the Clerk of Court shall ENTER JUDGMENT for defendant dismissing plaintiffs' petitions. No costs.

IT IS SO ORDERED.

### ORDER

Before the court is Tribes' Motion to Alter or Amend Judgment and for Rule 54(b) Certification (Tribes' Motion or Tribes' Mot.) filed June 23, 2010, Docket Number (Dkt. No.) 94 and Defendant's Response to Plaintiffs' Motion to Alter or Amend Judgment and for Rule 54(b) Certification (defendant's Response or Def.'s Resp.) filed July 12, 2010, Dkt. No. 95. Defendant summarized the Tribes' Motion and responded as follows:

> Plaintiffs' Motion consists of two parts. In the first part, [p]laintiffs request the [c]ourt make three corrections to its [O]pinion entered May 27, 2010 (see [Dkt.] No. 92). [Tribes'] Mot. 1–2. The United States does not oppose this request. In the second part, after describing in detail the phasing of the claims asserted in this litigation and what has transpired to date ( [Tribes' Mot.] [ ] 2–6), [p]laintiffs request [that] the [c]ourt "enter an amended judgment with respect to this consolidated subdocket only (Nos. [79–4582L] and [79–4592L] )[1] and certify the judgment as final for purposes of appeal." [Tribes' Mot.] [ ]

6. The United States does not oppose this request.

Def.'s Resp. 1. The Tribes' Motion addresses the Tribes' apparent concern that the court's entry of judgment in the above-captioned cases—which are subdockets of Case Numbers 79–458L and 79–459L, see Order filed Aug. 27, 2004, Dkt. No. 419 in Dkt. No. 79–458L and Order filed Feb. 23, 2005, Dkt. No. 4 in subdocket 79–4582L;[2] see also Order filed June 13, 2001, Dkt. No. 173 in Dkt. No. 79–458L[3]—will be misinterpreted in one of the following two ways (presumably not both): either the judgment will be read as (1) dismissing other aspects of the parties' disputes within other case numbers under Docket Numbers 79–458L and 79–459L, or (2) the judgment will not be read as appealable because it does not contain a certification under RCFC 54(b). See Tribes' Mot. 1.

In the court's view the purpose of the creation of one or more subdockets in complex litigation is to provide a vehicle for the treatment of a severable portion of a case as a separate case. The court agrees that the phrase "ENTER JUDGMENT for defendant dismissing Tribes' petitions" in its Opinion of May 27, 2010, see Dkt. No. 92, 21, could be understood by a reader without familiarity with the case as applying to all aspects of plaintiffs' petitions rather than to just those aspects of plaintiffs' petitions addressed in subdockets 79–4582L and 79–4592L in which the court's Opinion and the judgment are filed.

While the court would hope that the public record of the creation of the subdockets and the identification of claims within each (as reviewed in the Tribes' Motion, Tribes' Mot.

1. The court uses the current CM/ECF case numbering, which places the two-digit indication of the year of filing before the dash and the four-digit case number after the dash. See Docket (Dkt.) 79–4582L, Opinion filed May 27, 2010, Dkt. Number (No.) 92. This departs from the prior case numbering in the CM/ECF system, in which the four-digit portion of the case number preceded the two-digit portion indicating the year of filing. See Dkt. 79–458L, Order filed Feb. 23, 2005, Dkt. No. 426.

2. The Order of February 23, 2005 redesignates, inter alia, subdockets 79–458b and 79–459b as 79–4582L and 79–4592L, respectively. See Or-

der filed Feb. 23, 2005, Dkt. No. 4 in Dkt. 79–4582L.

3. This order created additional subdockets, 79–458a and 79–459a, from the original dockets 79–458L and 79–459L. Order of June 13, 2001, Dkt. No. 173 in Dkt. 79–458L. While these subdockets are not at issue in this case, plaintiffs appear to anticipate the dismissal of all subdockets under 79–458L and 79–459L because of the wording of the court's May 28, 2010 Opinion. See Tribes' Motion to Alter or Amend Judgment and for Rule 54(b) Certification (Tribes' Motion or Tribes' Mot.) filed June 23, 2010, Dkt. No. 94, 2.

4–7) would be adequate to address any temporary confusion, the court agrees that the better course is to amend its Opinion and to direct the amendment of the judgment as proposed by the Tribes, Tribes' Mot. 1–2, and as agreed to by defendant, Def.'s Resp. 1. Accordingly:

1. On page 3 of the May 27, 2010 Opinion, in the first paragraph of the section entitled "Background," is the following sentence:

All other aspects of the case have been resolved.

The sentence shall be changed to read as follows:

All other claims within this consolidated subdocket (Nos. 79–4582L and 79–4592L) have been resolved.

2. On page 21 of the May 27, 2010 Opinion, the second-to-last sentence reads as follows:

There being no further pending claims, the Clerk of the Court shall ENTER JUDGMENT for defendant dismissing plaintiffs' petitions.

The second-to-last sentence shall be changed to read as follows:

There being no further pending claims in this consolidated subdocket (Nos. 79–4582L and 79–4592L), and there being no just reason for delay, the Clerk of Court shall ENTER JUDGMENT for defendant dismissing plaintiffs' remaining claims in this subdocket.

3. The judgment entered on May 28, 2010, Dkt. No. 93, the second-to-last sentence reads as follows:

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiffs' petitions are dismissed.

The second-to-last sentence shall be changed to read as follows:

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiffs' remaining claims in this consolidated subdocket (Nos. 79–4582L and 79–4592L) are dismissed.

For the foregoing reasons, the Tribes' Motion is GRANTED.

IT IS SO ORDERED.