# United States Court of Appeals for the Federal Circuit

---

**THE SHOSHONE INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING,**
*Plaintiff-Appellant,*

**and**

**THE ARAPAHO INDIAN TRIBE OF THE WIND RIVER RESERVATION, WYOMING,**
*Plaintiff-Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellee.*

---

2010-5150

---

Appeal from the United States Court of Federal Claims in consolidated case nos. 79-CV-4582 and 79-CV-4592, *Chief Judge* Emily C. Hewitt.

---

Decided: January 9, 2012

---

HARRY R. SACHSE, Sonosky, Chambers, Sachse, Endreson & Perry, LLP, of Washington, DC, argued for plaintiff-appellant The Shoshone Indian Tribe of the Wind River Reservation, Wyoming. With him on the brief was WILLIAM F. STEPHENS.

RICHARD M. BERLEY, Ziontz, Chestnut, Varnell, Berley & Slonim, of Seattle, Washington, argued for plaintiff-appellant The Arapaho Indian Tribe of the Wind River Reservation, Wyoming. With him on the brief was BRIAN W. CHESTNUT.

JOAN M. PEPIN, Environment & Natural Resources Division, Appellate Section, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was IGNACIA S. MORENO, Assistant Attorney General.

———————————

Before PROST, MAYER, and O'MALLEY, *Circuit Judges*.

O'MALLEY, *Circuit Judge*.

The Shoshone Indian Tribe of the Wind River Reservation and the Arapaho Indian Tribe of the Wind River Reservation (collectively "the Tribes") appeal the United States Court of Federal Claims' dismissal of Claim II as time-barred by 28 U.S.C. § 2501 (2006), which bars all suits filed against the United States in the Court of Federal Claims unless filed within six years after the claim accrues. Because we conclude that the Tribes have alleged a continuing trespass, the Court of Federal Claims improperly determined that Claim II is time-barred in its entirety. Accordingly, as explained below, we vacate and remand for further proceedings.

## BACKGROUND

This dispute between the Tribes and the United States ("the Government") is a portion of two larger suits filed in 1979, which were consolidated. *See Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339, 1343 (Fed. Cir. 2004) ("*Shoshone*

*II*"); *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 93 Fed. Cl. 449, 452 (2010) ("*Shoshone III*"). This consolidated suit alleges that the Government breached fiduciary and statutory duties owed to the Tribes by mismanaging the Wind River Reservation's (the "Reservation") natural resources and the incomes derived from the exploitation of these resources. *Shoshone II*, 364 F.3d at 1343. The Court of Federal Claims divided the Tribes' suit into three different phases. One phase addressed sand and gravel and has been resolved via settlement. The other two phases were devoted to oil and gas issues. Oil and Gas Phase I, which has been fully resolved, involved the Government's failure to collect royalties for the period after October 10, 1973. Oil and Gas Phase II, on the other hand, addresses pre-1973 oil and gas royalty collection and a series of discrete oil-and-gas issues. Except for the second claim of this phase of the litigation – at issue here – all other aspects of the Phase II litigation have been resolved. *Shoshone III*, 93 Fed. Cl. at 452. In Claim II, the Tribes alleged that:

> [S]even oil and gas leases were allegedly unlawfully converted from Act of August 21, 1916 (the "1916 Act") leases, Pub. L. No. 64-218, 39 Stat. 519 (1916), to Indian Mineral Leasing Act (the "1938 Act") leases, Pub. L. No. 75-506, 52 Stat. 347 (1938) (codified at 25 U.S.C. §§ 396a-396g (2006)). [The Tribes] claim damages based on the theory that they would have obtained better royalty and renewal terms if the leases had remained 1916 Act leases instead of being converted to 1938 Act Leases.

*Shoshone III*, 93 Fed. Cl. at 451 (internal citation omitted). Resolution of the statute of limitations issue raised in this appeal requires a discussion of the history of the Tribes' relationship with the Government.

### A. Factual Background

### 1. History of the Reservation and Mineral Leasing

The Tribes share an undivided interest in the Reservation in Wyoming.[1] *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 51 Fed. Cl. 60, 61 (2001) ("*Shoshone I*"). On March 3, 1905, Congress ratified an agreement between the Government and the Tribes, whereby the Tribes ceded, granted, and relinquished to the Government all of their rights, title, and interest in approximately 1,480,000 acres of the Reservation. *Shoshone III*, 93 Fed. Cl. at 452; *see also* Pub. L. No. 58-185, 33 Stat. 1016, Art. I (1905). These so-called "ceded lands" were to be "disposed of by the United States under the provisions of the homestead, town-site, coal, and mineral land laws or by sale for cash—with proceeds to be paid to [the Tribes]." *Shoshone III*, 93 Fed. Cl. at 452 (citing 33 Stat. 1016, Art. II). The Government, moreover, agreed to act as trustee for the Tribes; it would dispose of the ceded lands and deliver the proceeds to the Tribes. *Shoshone III*, 93 Fed. Cl. at 452 (citing 33 Stat. 1016, Art. IX).

At some point around 1910, it became apparent that some of the ceded lands contained potentially valuable oil and gas resources. *Shoshone III*, 93 Fed. Cl. at 452. This discovery prompted Congress to enact the Act of August 21, 1916, Pub. L. No. 64-218, 39 Stat. 519-20 (1916) (the "1916 Act"), which authorized "the Secretary of the Interior to lease, for production of oil and gas, ceded lands of the [Reservation]." *Id.* Proceeds from these leases would be for the use and benefit of the Tribes. *Id.* Under the 1916 Act, leases: (1) were for a period of twenty years; (2)

---

[1]    For a detailed discussion of the history of the Reservation, see *Shoshone II*, 364 F.3d at 1342–43.

could be renewed for successive periods of ten years "upon such reasonable terms and conditions as may be prescribed by the Secretary of the Interior"; (3) had a minimum royalty rate of ten percent; and (4) if there was no oil or gas production, the leases had a rental rate of not less than one dollar per acre per year. *Id.*

Unlike the 1916 Act, which applied to the ceded lands of the Reservation, the Indian Mineral Leasing Act, Pub. L. No. 75-506, 52 Stat. 347 (1938) (codified at 25 U.S.C. §§ 396a–396g (2006)) (the "1938 Act"), does not apply to ceded lands. *Id.* at § 396f. While the 1916 Act leases were for fixed periods and did not require oil or gas production, leases under the 1938 Act were "for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities." *Id.* at § 396a. In addition, leases under the 1938 Act are between the lessee and the Tribes. *Id.* The 1938 Act, moreover, requires competitive bidding for new leases. *Id.* at § 396b.

Shortly after passage of the 1938 Act, Congress ordered the Secretary of the Interior to restore ownership of "all undisposed-of surplus or ceded lands within" the Reservation to the Tribes. Act of July 27, 1939, Pub. L. No. 76-238, 53 Stat. 1128 (1939). On May 17, 1940, and August 10, 1944, the Secretary of the Interior restored all seven Claim II parcels to the Tribes, subject to any valid existing rights. *Shoshone III*, 93 Fed. Cl. at 453 (citations omitted). While the seven Claim II parcels were no longer ceded lands, the 1916 Act leases for these parcels remained in force. Of course, any new leases for restored portions of the Reservation, which were not previously leased, would have to be made pursuant to the 1938 Act because such lands were no longer ceded.

### 2. Conversion of the Seven Claim II Leases

After the 1940 and 1944 restoration of ceded lands, in 1948, the British-American Oil Producing Company ("British-American") asked the superintendent of the Wind River Agency to convert two of the seven existing 1916 Act leases into 1938 Act leases. Joint Appendix ("J.A.") 156. Both of these leases were productive and in their initial twenty-year term. *Id.* In response to this request, in May of 1948, the Government and British-American presented the proposal to the Tribes' Joint Business Council ("the Council").[2] J.A. 159; Appellants' Br. 11. After the Government's representative discussed British-American's proposal and some of the differences between 1916 Act leases and 1938 Act leases, the Council unanimously voted to approve the conversion of the leases. J.A. 159–60. Following this meeting, the Council adopted Resolution No. 152, which resolved "that the Commissioner of Indian Affairs be requested to . . . convert the two said leases . . . ." J.A. 161. These leases were prepared and signed by the two Council chairmen on February 11, 1949. J.A. 165, 169.

In 1949, the Husky Refining Company ("Husky") requested that five of its 1916 Act leases be converted into 1938 Act leases. Unlike the converted British-American leases, these leases' initial twenty-year term had expired, so the leases were up for renewal. As with the British-American leases, the Council voted to approve the conversion of the five Husky leases. J.A. 172. Resolution 153 issued in response to this approval, directing "new leases be prepared in favor of the Husky Refining Company, covering the restored tribal lands described in the said

---

[2] The Joint Business Council consists of the Shoshone Business Council and the Arapaho Business Council, but not the United States." Appellants' Br. 11.

contracts on the current tribal lease form, as provided for in the Act of May 11, 1938." J.A. 173. Four of these leases were executed by the Tribes on August 10, 1949, while the fifth was executed on July 21, 1950.

Despite the conversion of these seven leases, when British-American requested conversion of another lease in 1957, the Government stated that "[i]t is deemed inadvisable to issue a renewal lease under the [1938 Act] as it requires that the leases be advertised for competitive bids." J.A. 202. Accordingly, this lease was never converted.

## B.  Procedural History

In 2005, after the Court of Federal Claims consolidated the two suits and divided the Tribes' suit into phases, it ordered the Tribes to submit "a statement identifying the issues to be resolved" in the Oil and Gas Phase II portion of the litigation. Court of Federal Claims Order of June 6, 2005 at 1–2, 1:79-cv-4582, ECF No. 12. In response, the Tribes identified Claim II: "Failure to collect amounts due under 1916 act leases by illegally converting to 1938 Act leases." Tribes' Statement Identifying Oil and Gas Phase Two Issues at i, Jan. 13, 2006, 1:79-cv-4582, ECF No. 20. Specifically, the Tribes alleged that "[t]hese conversions were illegal, costing the Tribes the difference in royalty that they could have obtained if these leases had remained 1916 Act leases." *Id.* at 11. The Tribes sought damages beginning on the date upon which each conversion occurred through December 31, 2000. *Id.*

The relevant facts associated with Claim II of Phase II were developed jointly by the Government and the Tribes "in lieu of an accounting by the [Government]." *Shoshone III*, 93 Fed. Cl. at 452 (citation omitted). In accordance with this joint development, in 2007, "the

parties shared documents including leases, letters, and similar materials [that] have been supplemented by additional discovery. Also in 2007, the parties shared expert reports that discussed, inter alia, Claim II and damage calculations." *Id.* (internal quotation marks and citations omitted). In response to this discovery, the Government moved for judgment on the pleadings.[3] *Id.* at 451.

In its motion, the Government argued that the Tribes' claim was time-barred by 28 U.S.C. § 2501 because it was not filed within six years of the date on which it first accrued. *Shoshone III*, 93 Fed. Cl. at 451. In opposition, the Tribes argued that Claim II is timely because: (1) the claim did not accrue until after the Tribes' suit was filed; (2) the Interior Appropriations Act deferred accrual of the claim; and (3) the claim is for a continuing trespass.[4] *Id.* at 454–63.

In support of its contention that Claim II did not accrue until after the Tribes filed their complaints in 1979, the Tribes argued that they did not have actual or inquiry notice of the conversions. A claim premised upon a breach of trust accrues only when the trust beneficiary knows the trustee has repudiated the trust. *Shoshone II*, 364 F.3d at 1348 (citations omitted). The Tribes asserted that, because they lacked this knowledge, Claim II did not accrue

---

[3] In addition, the Tribes moved for summary judgment. *Id.* at 451. Because it granted the Government's motion, the Court of Federal Claims found the Tribes' motion moot. *Id.* This judgment has not been appealed.

[4] The Tribes also made an argument in support of Claim II's timeliness premised upon survival of the 1916 Act leases. Pls.' Resp. to Def.'s Mot. J. on the Pleadings at 20–21, October 29, 2009, 1:79-cv-4582, ECF No. 74. The Court of Federal Claims rejected this argument. *Shoshone III*, 93 Fed. Cl. at 463–64. The Tribes are not appealing this determination.

until after their complaints were filed. The Court of Federal Claims, however, concluded that, because the Tribes approved and executed the leases in question, the Tribes had actual knowledge of the lease conversions. *Id.* at 456.

In addition, the Tribes argued that Claim II had not accrued when they filed their suit because the claim's accrual was tolled. The Tribes asserted that Claim II's accrual was tolled under common law because: (1) the injury caused by the conversions was "inherently unknowable"; and (2) the Government concealed information from and affirmatively misled the Tribes. Pls.' Resp. to Def.'s Mot. J. on the Pleadings at 5–13, Oct. 29, 2009, 1:79-cv-4582, ECF No. 74. The Court of Federal Claims held that, on the basis of a 1959 letter from the Tribes' counsel to the Government, Claim II was not inherently unknowable. *Shoshone III*, 93 Fed. Cl. at 457–58. The Court of Federal Claims explained that:

> While it is unclear from the content of the letter whether plaintiffs' attorneys understood exactly when and how the 1916 Act leases were converted to 1938 Act leases, the letter demonstrates a noticeable level of concern as to the management of the leases and whether the government was making decisions in line with its duty as a trustee "to make as good a bargain for the [Tribes] as a prudent and informed oil and gas operator would make for himself." This letter undermines plaintiffs' contentions that they neither knew of the conversions nor had reason to question the government's actions regarding the leases.

*Id.* at 458 (internal citation omitted).

Similarly, with respect to the Government's alleged concealment and misrepresentations, the Court of Federal

Claims held that neither tolled the accrual of Claim II. *Id.* at 459. Based on the same 1959 letter, the Court of Federal Claims concluded that the Tribes had a "heightened level of concern about leasing." *Id.* This heightened level of concern "should have led to a broader inquiry as to the status of the leases and, if appropriate, to legal action." *Id.* The Court of Federal Claims concluded therefore that, as of 1959, "plaintiffs had knowledge that should have prompted an inquiry regarding the lease conversions." *Id.* Having determined that neither the general rules that defer trust claims from accruing, nor the general rules that suspend claim accrual were applicable to Claim II, the Court of Federal Claims turned to the Tribes' argument that the Interior Appropriations Act suspended Claim II from accruing.

As explained by the Court of Federal Claims, "Congress has enacted within a series of appropriations acts covering the United States Department of the Interior provisions which suspend accrual of the statute of limitations for certain tribal trust claims . . . ." *Id.* These provisions apply only to a "claim . . . concerning losses to or mismanagement of trust funds . . . ." *Id.* at 460 (quoting the Consolidated Appropriations Act of 2005, Pub. L. 108-447, 118 Stat. 2808, 3060-61 (the "Interior Appropriations Act").[5] Despite the Tribes' assertion that Claim II concerned mismanagement of trust funds, the Court of Federal Claims held that it "is more readily characterized as mismanagement of an asset, a matter explicitly excluded . . . from the Appropriations Act." *Id.* at 462 (citing *Shoshone II*, 364 F.3d at 1350).

Finally, the Court of Federal Claims rejected the Tribes' argument that Claim II asserts a continuing

---

[5]   Congress has included this provision without modification in all recent Interior Appropriations Acts.

trespass. *Shoshone III*, 93 Fed. Cl. at 462. The Tribes' argument was premised upon the fact that the converted 1938 Act leases were invalid. In light of this fact, the Tribes argued that oil and gas operators were trespassing when they extracted resources from the seven parcels in question. Accordingly, the Tribes argued that each oil and gas extraction that the Government failed to prevent supported a separate claim against the Government. The Court of Federal Claims found, however, that "[t]he oil and gas operators who extracted minerals from the seven parcels in this case were doing so under the authority of lease agreements executed by the Tribes themselves" and, thus, could not be characterized as trespassers. *Id.* Based on this conclusion, the Court of Federal Claims rejected the Tribes' continuing trespass argument. *Id.*

In light of these determinations, the Court of Federal Claims granted the Government's motion, and entered judgment for the Government. *Id.* at 464. The Tribes timely appealed. We review final judgments of the Court of Federal Claims pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

The limitations period in 28 U.S.C. § 2501 is jurisdictional. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136–39 (2008). Whether the Court of Federal Claims possesses jurisdiction over a claim is a question of law that is subject to de novo review. *Navajo Nation v. United States*, 631 F.3d 1268, 1272 (Fed. Cir. 2011). When reviewing a decision of the Court of Federal Claims to grant judgment on the pleadings, we presume that the facts alleged by the plaintiffs are true, and we draw all reasonable inferences in the plaintiffs' favor. *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009). When a party brings a motion for judgment on the pleadings premised on lack of subject matter jurisdiction, the

motion should be treated as if it had been brought under Federal Rule of Civil Procedure 12(b)(1). *Renewal Body Works, Inc. v. United States*, 64 Fed. Cl. 609, 612–13 (2005) (treating the defendant's motion for judgment on pleadings based upon plaintiff's claim being barred by § 2501's statute of limitations as a 12(b)(1) motion); 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Civil Procedure § 1367, at 221 (3d ed. 2004). If a Rule 12(b)(1) motion challenges a complaint's allegations of jurisdiction, the factual allegations in the complaint are not controlling and only uncontroverted factual allegations are accepted as true. *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583 (Fed. Cir. 1993) (citations omitted). In resolving these disputed predicate jurisdictional facts, "a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings . . . ." *Id.* at 1584 (citations omitted).

On appeal, the Tribes argue that § 2501 does not bar Claim II because: (1) "the Tribes neither knew nor should have known of Claim II until after they filed this suit"; (2) the claim relates to losses to trust funds such that accrual is statutorily deferred; and (3) "the Tribes have a continuing claim against the government for allowing production of tribal oil and gas without valid leases." Appellants' Br. 20, 33, 36. In response, the Government argues that the Court of Federal Claims properly concluded that § 2501 bars Claim II. Each of the Tribes' arguments will be discussed below in turn.

I.

The statute of limitations provision of § 2501 places a limit on the Government's waiver of sovereign immunity for claims within the jurisdiction of the Court of Federal Claims. *Shoshone II*, 364 F.3d at 1346. Such claims "shall be barred unless the petition thereon is filed within

six years after such claim first accrues." 28 U.S.C. § 2501. Generally, under § 2501, a claim does not accrue until "all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988); *see also Fallini v. United States*, 56 F.3d 1378, 1380 (Fed. Cir. 1995) ("The question whether the pertinent events have occurred is determined under an objective standard; a plaintiff does not have to possess actual knowledge of all the relevant facts in order for the cause of action to accrue.").

A cause of action for breach of trust, moreover, only "accrues when the trustee 'repudiates' the trust *and* the beneficiary has knowledge of that repudiation." *Shoshone II*, 364 F.3d at 1348 (emphasis added) (citing *Hopland Band of Pomo Indians*, 855 F.2d at 1578; Restatement (Second) of Trusts § 219 (1992); *Cobell v. Norton*, 260 F. Supp. 2d 98, 105 (D.D.C. 2003); *Manchester Band of Pomo Indians v. United States*, 363 F. Supp. 1238, 1249 (N.D. Cal. 1973)). The trustee may repudiate the trust by taking actions inconsistent with his responsibilities as a trustee or by express words. *Jones v. United States*, 801 F.2d 1334, 1336 (Fed. Cir. 1986) (citing *Philippi v. Philippe*, 115 U.S. 151, 157 (1885)); *see also Shoshone II*, 364 F.3d at 1348 ("[P]lacing the beneficiary on notice that a breach has occurred," is sufficient to establish the beneficiary's knowledge of the repudiation).

The Tribes argue that Claim II did not accrue until after they filed their complaint because: (1) the Government concealed its actions, resulting in the Tribes' being unaware of the claim; and (2) the Tribes had "no reasonable way . . . to determine *any* of the damages caused by the illegal 'conversion' until well after this suit was filed." Appellants Br. 21, 28. In response, the Government

asserts that the Court of Federal Claims correctly held that Claim II was untimely because the Tribes had actual knowledge of all the facts material to Claim II at the time the conversions took place. Appellee's Br. 22–24. For the reasons explained below, on this issue, we agree with the Government.

The Tribes assert that the Government's omissions and misstatements with respect to critical information prevented them from being aware of Claim II. Specifically, the Tribes assert that the Government told them that the conversions were legal, failed to inform the Tribes of the potential economic consequences of the conversions, and failed to explain that the replacement 1938 Act leases would be awarded without competitive bidding. Although it is undisputed that the "statute of limitations can be tolled where the government fraudulently or deliberately conceals *material facts* relevant to a plaintiff's claim so that the plaintiff was unaware of their existence and could not have discovered the basis of his claim," *Hopland Band of Pomo Indians*, 855 F.2d at 1577 (emphasis added), this exception to the general rule of claim accrual is not applicable to the facts alleged here.[6]

---

[6]    As this court explained in *Hopland Band of Pomo Indians*,

> Although not always clearly stated or recognized in the "tolling" case law, the distinction that must be drawn is that between tolling the commencement of the running of the statute (a tolling of the accrual) and tolling the running of the statute once commenced (a tolling of the statute). In suits against the government brought under section 2501, the distinction can be critical because the former routinely is allowed while the latter rarely is.

Here, the Government's alleged omissions and mis-statements did not prevent the Tribes from being aware of the material facts that gave rise to their claim. Instead, the alleged misstatements and omissions, at most, failed to inform the Tribes of their legal rights. It is settled law, however, that § 2501 "is not tolled by the Indians' igno-rance of their *legal* rights." *Menominee Tribes of Indians v. United States*, 726 F.2d 718, 720–21 (Fed. Cir. 1984) (citing *Affiliated Ute Citizens of the State of Utah v. United States*, 199 Ct. Cl. 1004 (1972) and *Capoeman v. United States*, 440 F.2d 1002 (Ct. Cl. 1971)); *see also Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1572 (Fed. Cir. 1993) ("But in the case before us, all the relevant facts were known. It was the meaning of the law that was misunderstood.").

For example, the Tribes make much of the fact that the Government's representative told the Tribes that the conversions were legal and failed to inform the Tribes when it later determined that the lease conversions were illegal.[7] This misinformation and omission, however, only misled the Tribes regarding their legal rights. There is no question that the Tribes were aware of – *and in fact approved* – the conversions. As explained in both *Me-*

---

855 F.2d at 1578. Here, the Tribes argue that accrual was tolled, i.e., the former instance referenced in *Hopland Band of Pomo Indians.*

[7] The Government did not actually state in 1957 that the conversions were illegal; it merely concluded that "[i]t is deemed inadvisable to issue a renewal lease under this act as it requires that the lease[] be advertised for competitive bids." J.A. 202. Before this court, the Gov-ernment concedes that the 1938 Acts had "harmless" procedural irregularities, but still contends they were not "illegal." As explained below, the Government is wrong and cannot avoid the illegality of the leases with seman-tics.

*nominee* and *Catawba*, a trust beneficiary's subjective ignorance of the law giving rise to its claim, even if predicated on misleading statements relating to those legal rights, does not toll the accrual of the statute of limitations. *Menominee*, 726 F.2d at 720–21; *Catawba*, 982 F.2d at 1570–71.

Indeed, as we made clear in *Catawba*, even an affirmative incorrect assertion that the conversions were legal would not toll the accrual of Claim II. *Catawba*, 982 F.2d at 1570–71 (affirming the Court of Federal Claims' dismissal of the Catawba's suit as barred by § 2501 and finding the Government's inaccurate representations to the Catawba Indian Tribe regarding the law irrelevant because only the objective meaning of the Act effected the tolling of the statute of limitations, and the Catawba Tribe's misunderstanding of the law, even if premised on the Government's advice, could not change the objective meaning of the Act).

Similarly, here, the Government's purported assurances that the conversions were legal are simply not relevant. What matters is whether the relevant Acts would have objectively put the Tribes on notice that the conversions were illegal. Because the explicit language in the 1938 Act indicates that all leases under the Act must be noticed, advertised, and competitively bid, it was clear that any lease adopted without these formalities would be invalid and not in accordance with law. Under the objective standard that applies to the accrual of a claim for breach of fiduciary and statutory duties, the Tribes cannot toll the accrual of the statute of limitations by contending that they were unaware of the requirements of the 1938 Act.

The Tribes also argue that accrual did not occur until after they filed suit because the Government's representa-

tive told them "that the main difference [between the 1916 Act and 1938 Act leases] was that the new leases would be 'approved and signed by the Tribes' rather than the Secretary" while affirmatively misinforming the Tribes that the conversions "would have no economic consequences, with the leases having the 'same rent and royalty.' " Appellants' Br. 22. The Tribes assert that these misstatements of fact prevented them from understanding that they would be damaged by the conversions and what the extent of that damage would be.

This court has, however, " 'soundly rejected' the contention 'that the filing of a lawsuit can be postponed until the full extent of the damage is known.' " *Navajo Nation*, 631 F.3d at 1277 (quoting *Boling v. United States*, 220 F.3d 1365, 1371 (Fed. Cir. 2000)). The failure to follow the notice, advertisement, and competitive bidding requirements of the 1938 Act when the conversions occurred was the harm suffered by the Tribes; the economic consequences of the new leases may define the scope of that harm, but they are not the event that triggers the statute of limitations. *See id.* (explaining that, for determining when the statute of limitations begins to run, "the 'proper focus' must be 'upon the time of the [defendant's] acts, not upon the time at which the *consequences* of the acts [become] most painful.' ") (quoting *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)); *Catawba*, 982 F.2d at 1571 (concluding that, "[w]hether the harm was caused to the [Catawba Indian] Tribe by the Act itself or by Government misrepresentations about what the effect of the Act might be, the 'damage' was done when the Act became effective in 1962").

We reach this conclusion despite the Tribes' argument that the damages they suffered were unknowable. While they assert that, because of the complexity and opacity of the oil and gas leasing system employed at Wind River

and the manner in which they were paid royalties, "there was no reasonable way for the Tribes to determine any of the damages caused by the illegal 'conversions' until well after this suit was filed," Appellants' Br. 28–29, this argument misses the point. As *Navajo Nation* makes clear, the Government's misstatements and omissions about the economic consequences of the conversions, at most, prevented the Tribes from being aware of the full extent of their injury. But lack of this knowledge is not sufficient to toll the accrual of § 2501's statute of limitations for Claim II. And, as we have explained, the clear language of the 1938 Act establishes that the Tribes should have known that creating a 1938 Act lease without competitive bidding was not legal.

The only question that remains regarding the Tribes' common law tolling arguments is whether the Tribes were or should have been aware that the seven leases in question were not competitively bid. Although the Government admits "to date that it has not uncovered information which confirms that the Tribes were advised by the United States prior to Conversion of any Converted Lease that the Conversion would be carried out without Competitive Bidding," J.A. 246, this admission does not resolve the question in favor of the Tribes. As we have previously noted, the court's inquiry is an objective one. Whether the Tribes actually knew that the seven leases were not competitively bid is irrelevant if they objectively should have known this fact. We conclude that the Tribes should have known that the leases were not competitively bid.

With respect to the two British-American leases, British-American sent a letter asking for the 1916 Act leases to be "exchange[d]" for 1938 Act leases. J.A. 156. This letter was read to the Joint Business Council before it voted to approve the new leases. J.A. 159. In addition, at

the meeting, the Government's representative stated that "British-American is asking for your consideration to convert these two ceded leases into new leases under the existing regulations." J.A. 159. Significantly, a member of the council acknowledged the ability to put the leases up for bids, but he expressed his preference to have the leases converted. J.A. 160 ("We could put the new lease up for bids. I move that permission be granted to change the old lease forms to the new."). The transcript of this meeting makes clear that the Tribes should have known the leases were not being competitively bid. British-American's proposal was to convert the 1916 Act leases into 1938 Act leases. This intent was made clear. Although competitive bidding was mentioned, it was only mentioned as an option that was immediately rejected in favor of converting the leases. Finally, the resolution approving British-American's proposal states that the leases were being converted. Based on these facts, the Tribes appear to have actually been aware that the leases were not being competitively bid. Even if they lacked this subjective knowledge, based on the facts recited above, objectively, they should have known.

We reach the same conclusion with respect to the five Husky leases. The transcript of this Joint Business Council meeting reveals that it was very similar to the meeting held to approve the conversion of the British-American leases. The only real difference was that Husky's letter requesting the conversion was not read to the council. The key facts remain unchanged: the council was told that Husky wanted to convert its 1916 Act leases into 1938 Act leases, and there was no mention of competitive bidding. As with the British-American leases, the Tribes approved the conversions of the five Husky leases. The resolution approving Husky's proposal stated that it was approving Husky's written request "to convert its

ceded leases . . . to the leasing terms as provided for in Section 6 of the [1938 Act.]" J.A. 173. These facts establish that the Tribes should have known that the five Husky leases were not competitively bid.

Despite the alleged misstatements and omissions by the Government, the Tribes were not prevented from knowing all of the material facts that established the Government's liability for Claim II. The Tribes actually approved the conversion of the leases. They had actual knowledge of all the relevant facts related to the conversions. The Tribes' injury was having the leases approved without following the notice, advertisement, and competitive bidding requirements of the 1938 Act. Because of their involvement in the approval of the leases, the Tribes should have known that the leases were not competitively bid. And, thus, that the repudiation of the trust upon which their claim is premised had occurred. Accordingly, the Court of Federal Claims correctly concluded that accrual of their claim was not tolled.[8]

## II.

Before we can conclude that Claim II is untimely, we also must determine whether the tolling provision in the Interior Appropriations Act is applicable to Claim II. In relevant part, the Interior Appropriations Act provides that:

---

[8] In reaching its conclusion that Claim II accrued more than six years before the Tribes filed their suit, the Court of Federal Claims emphasized a letter from the Tribes' attorney to the Government. *Shoshone III*, 93 Fed. Cl. at 457–59. The Tribes assert that this was error. Because we conclude that the Tribes knew or should have known all of the material facts necessary for Claim II to accrue before this letter was drafted, the Tribes' argument is moot.

> [N]otwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim . . . concerning losses to or mismanagement of trust funds, until the affected tribe . . . has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

Department of the Interior Appropriations Act of 2009, Pub. L. No. 111, 123 Stat. 2904 (2009) ("Interior Appropriations Act"). In *Shoshone II*, this court drew a distinction between losses to and mismanagement of trust *funds*, and losses to and mismanagement of trust *assets*. 364 F.3d at 1351. We explained that the Interior Appropriations Act applies to losses or mismanagement of trust funds only. On the basis of this distinction, we concluded that "the [Interior Appropriations] Act covers any claims that allege the Government mismanaged funds after they were collected, as well as any claims that allege the Government failed to timely collect amounts due." *Id.* Explaining the distinction, we stated that "[w]hile it is true that a failure to obtain a maximum benefit from a mineral asset is an example of an action that will result in a loss to the trust, the Act's language does not on its face apply to claims involving trust *assets*." *Id.* at 1350. In other words, claims related to trust funds involve losses "resulting from the Government's failure to timely collect amounts due and owing to the Tribes" under relevant contracts, while claims related to trust assets involve losses resulting from the terms of a contract being suboptimal. *Id.* at 1350–51.

The Tribes argue that Claim II relates to losses of trust funds because the converted leases were inconsistent with the requirements of the 1938 Act. In addition, the Tribes argue that this claim relates to trust funds because the 1916 Act leases should have remained in

effect, and the Government's failure to collect royalties under those leases caused losses to trust funds. As discussed below, these arguments are not well-taken.

First, the Tribes' complaint about the lease conversions is that they have lower royalty rates under the 1938 Act leases than they would now be earning under the 1916 Act leases. In *Shoshone II*, however, we expressly concluded that losses associated with this type of claim are losses to trust assets, not trust funds. 364 F.3d at 1350 ("Even if a claim for a breach of the fiduciary duty to obtain a maximum return from the mineral assets had been available, however, the plain language of the [Interior Appropriations] Act excludes such a claim."). A claim premised upon the terms of a lease being suboptimal is a claim related to trust assets, and, therefore, outside of the scope of the Interior Appropriations Act's tolling provision.

Second, a claim premised upon the Government's failure to collect royalties in accordance with a hypothetical lease is a claim for mismanagement of trust assets. As we explained in *Shoshone II*, a claim premised upon a failure to collect royalties due under an *existing* contract or lease is a claim based upon losses to trust funds. *Id.* A claim based on a non-existing lease or contract is, therefore, outside the scope of the Interior Appropriation Act's tolling provision. Because Claim II is for mismanagement of trust assets, the Court of Federal Claims properly concluded that the Interior Appropriations Act does not toll the running of the six-year statute of limitations for Claim II.

## III.

Finally, the Tribes argue that, even if Claim II is barred by § 2501, because the claim is based upon a continuing trespass, the Tribes can still bring suit for

injuries occurring within six years of their filing suit and
all injuries that occurred thereafter. In support of this
argument, the Tribes assert that the seven converted
leases are void because no competitive bidding occurred.
Because the leases are void, the oil companies extracting
oil under these leases are trespassers. As trustee, the
Tribes assert, the Government had a duty to eject the oil
companies. The Tribes argue that, under the continuing
trespass theory, each trespass is its own cause of action
with its own six-year statute of limitations.[9]  *See, e.g.,*

---

[9]    To the extent that the Court of Federal Claims
held that *Brown Park Estates-Fairfield Dev. Co. v. United
States*, 127 F.3d 1449 (Fed. Cir. 1997), precluded the
Tribes from asserting that Claim II represented a con-
tinuing trespass, it was incorrect. In *Brown Park*, we
concluded that, because the plaintiffs sought damages for
the cumulative effect of alleged breaches by the Govern-
ment that were outside of the six-year statute of limita-
tions period, the plaintiffs' suit did not represent a
continuing claim. *Id.* at 1457–58. Explaining the basis of
the plaintiffs' claim, we stated:

> They argue that on account of HUD's breaches
> outside the period of the statute of limitations,
> HUD started from the wrong base when making
> rent adjustments during the six years prior to the
> filing of suit. Thus, the alleged improper base for
> these latter years relates directly to, and is com-
> pletely dependent on, whether HUD failed to
> make rent adjustments in earlier years in viola-
> tion of the HAP contracts.

*Id.*  We explicitly distinguished this claim from one in
which a plaintiff sought damages for the Government's
failure to make rent adjustments within the six-year
period. *Id.* at 1457. Here, the Tribes' claim is akin to this
hypothetical discussed in *Brown Park*. Under the Tribes'
trespass theory, this is not a case in which the Tribes are
asserting that the cumulative effects of an act which
occurred outside of the six-year statute of limitations
period caused them harm; instead, the Tribes premise

*United States v. Hess*, 194 F.3d 1164, 1177 (10th Cir. 1999) ("In trespass cases, where the statute of limitations has expired with respect to the original trespass, but the trespass is continuing, we and other courts have calculated the limitation period back from the time the complaint was filed, rather than forward from the date of the original trespass, or where applicable, back to the reasonable discovery date."); *Cherokee Nation of Okla. v. United States*, 21 Cl. Ct. 565, 571 (Fed. Cl. 1990) (explaining that plaintiff's claims for trespasses that occurred more than six-years before the suit was filed were barred by the statute of limitations, but that claims for trespasses that occurred less than six-years from the filing of suit were not barred by the statute of limitations); *cf. Oenga v. United States*, 83 Fed. Cl. 594, 597–98, 616–19 (2008) (allowing the plaintiffs to proceed on a theory that every time the defendant used their property for oil and gas development a separate trespass occurred).

In response, the Government argues that: (1) the Tribes' trespass claims are not within the scope of Claim II; (2) the seven converted leases are not void; (3) even if the leases are void, the lessees were not trespassers; and (4) the Government had no duty to remove the alleged trespassers. For the reasons explained below, we agree with the Tribes as to the first three points and conclude that the Court of Federal Claims incorrectly determined that the Tribes' continuing trespass theory was inapplicable. With respect to the fourth argument, we conclude that this case must be remanded to the Court of Federal Claims for further development of the record.

---

their breach of fiduciary duty claim on the Government's failure to remove trespassers from the seven parcels. Assuming the Government had a duty to eject the trespassers, every time the Government failed to remove the trespassers a new cause of action arose.

We first address the Government's argument that the Tribes' trespass claims are not within the scope of Claim II. The Tribes' original petitions asserted that the Government "failed to oversee, monitor, and administer . . . oil and gas leases . . . ." J.A. 31 (Shoshone Indian Tribe's Petition). Twenty-six years after the Tribes filed their petitions, the Court of Federal Claims ordered the Tribes to provide a detailed statement of the issues to be resolved in Phase Two of this litigation. In response, the Tribes described eleven claims related to Phase Two. The Tribes stated that Claim II was based upon the Government's "Failure to Collect Amounts Due Under 1916 Act Leases by Illegal Conversion to 1938 Act Leases." Tribes' Statement Identifying Oil and Gas Phase Two Issues at i, Jan. 13, 2006, 1:79-cv-4582, ECF No. 20. The Tribes specifically alleged that "[t]hese conversions were illegal, costing the Tribes the difference in royalty that they could have obtained if these leases had remained 1916 Act leases." *Id.* at 11.

Though the Government raised this same scope of Claim II argument before the Court of Federal Claims, the Court of Federal Claims addressed the merits of the Tribes' continuing trespass claim without discussing this point. In doing so, the Court of Federal Claims implicitly rejected the Government's "scope" argument. Given that court's familiarity with this long-standing case, we defer to its decision regarding the proper scope of Claim II, absent clear error, which we do not discern. *See Skinner v. Switzer*, 131 S. Ct. 1289, 1296 (2010) ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory. Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument.") (citation omitted). We note, moreover, that

the Tribes expressly asserted an "illegal conversion" of the leases; a claim which the Court of Federal Claims could reasonably conclude encompassed the concept of trespass. Tribes' Statement Identifying Oil and Gas Phase Two Issues at i, Jan. 13, 2006, 1:79-cv-4582, ECF No. 20.

Turning to the Government's second and third arguments — i.e., that the leases are not void, or in the alternative that, even if the leases are void, the lessees are not trespassers — we disagree with the Government on both points. With respect to the validity of the leases, the Government asserts that the seven leases are not void because the Tribes authorized the leases knowing they had not been competitively bid and that the failure to put the leases out to bid was "harmless."[10]

There is no dispute that the 1938 Act requires leases to be competitively bid. 25 U.S.C. § 396(b) ("Leases for oil-and/or gas-mining purposes . . . shall be offered for sale to the highest responsible qualified bidder, at public action or on sealed bids . . . ."). All conveyances of Indian lands must occur, moreover, in accordance with the Nonintercourse Act, providing that "[n]o purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution." 25 U.S.C. § 177. Such conveyances must, therefore, be made in accordance with a federal treaty or statute. *See United States v. S. Pac. Transp. Co.*, 543 F.2d 676, 697 (9th Cir. 1976) (concluding that an agree-

---

[10] The Government also argues that, even if the 1938 Act leases are void, its cancellation of the 1916 Act leases was valid and noncompensable; this argument merits little discussion. We reject it both because it is improperly made in the procedural posture of this case and is inconsistent with all facts in the record before us.

ment between an Indian Tribe and Southern Pacific's predecessors did not grant an easement over unceded lands because no treaty or statute authorized the conveyance); *Sangre de Cristo Dev. Co. v. United States*, 932 F.2d 891, 894–95 (10th Cir. 1991) (concluding that a lease with an Indian Tribe was invalid because the Department of the Interior did not comply with the requirements of the statute authorizing the conveyance). Although there is no Federal Circuit precedent addressing this matter, we agree with the reasoning in *Southern Pacific* that the statutory requirements regarding the transfer of Indian lands may not be waived or ignored.

In *Southern Pacific*, the railroad operated a railway through an Indian Reservation. 543 F.2d at 680. Although the railway had been in place for ninety years and the Indian Tribe made agreements with the railroad's predecessor authorizing the easements, the United States Court of Appeals for the Ninth Circuit concluded that, with respect to the lands the Tribe did not cede to the United States, the easements were void. *Id.* at 699. Reaching this conclusion, the court determined that, although the Department of the Interior approved the easements, because no statute or treaty authorized the conveyances, the easements were void. *Id.* at 692–93, 697–99. As in *Southern Pacific*, here, the fact that both the Department of the Interior and the Tribes approved the leases is irrelevant. *See also Sangre*, 932 F.2d at 895 ("Because we read [the statute authorizing the conveyance] as requiring a valid approval from the Department in order for the lease contract to have legal effect, the invalid lease contract between Sangre and the Pueblo vested no property interest in Sangre."). What is relevant is the fact that the leases were not entered into in compliance with the requirements of the 1938 Act.

While the Government argues that its failure to competitively bid the seven leases was harmless, and, therefore, should not void the leases in question, the Supreme Court has rejected a similar argument. *See Smith v. McCullough*, 270 U.S. 456, 463–65 (1926) (holding a lease void in its entirety because the Indian allottee leased a portion of his federally granted allotment for a period of more than ten years in violation of the provision granting the allotment, which capped the length of such a lease at ten years). Because the Nonintercourse Act requires a federal statute or treaty to authorize conveyances between an Indian Tribe and a third party, failure to strictly comply with the requirements of such a statute renders any resulting conveyance void. *See S. Pac. Transp. Co.*, 543 F.2d at 697; *Sangre*, 932 F.2d at 894–95.

Anticipating this conclusion, the Government next argues that, even if the leases are void, the lessees would be tenants at sufferance or tenants at will, i.e., the lessees would have a license, and would, thus, not be trespassers. In support of this argument, the Government relies on principles of Landlord and Tennant law. This reliance is misplaced.

In a closely analogous case, the Supreme Court suggested that conveyances between an Indian Tribe and a third party that are not in compliance with relevant statutes create no implied rights. *Bunch v. Cole*, 263 U.S. 250, 253–54 (1923) ("The Supreme Court of the State . . . construed and applied a statute of the state as in effect requiring that the leases be regarded as creating a tenancy at will . . . . [W]e think the conclusion is unavoidable that [the state statute] gives force and effect to leases which a valid enactment of Congress declares shall be of no force or effect, and that in this respect [the state statute] must be held invalid . . . ."); *see also McCullough*, 270 U.S. at 465 (holding that, instead of allowing the lease to

remain in effect for the ten year period authorized by statute, the lease was completely void because "where an allottee undertakes to negotiate a lease for a forbidden term he enters a field in which he must be regarded as without capacity or authority to negotiate or act and that the resulting lease is void"). As the Ninth Circuit reasoned in *Southern Pacific*, "[t]o give effect to an invalid attempt to convey an interest in tribal lands in violation of the statute by holding that it creates a license would undermine [the] purpose" of the Nonintercourse Act. 543 F.2d at 698. That purpose has been described by the Supreme Court as "prevent[ing] unfair, improvident or improper disposition by Indians of lands owned or possessed by them to other parties . . . ." *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 119 (1960). Treating these leases as creating a tenancy at sufferance or at will would run counter to this very purpose.

Contrary to this guidance, the Court of Federal Claims distinguished the cases cited by the Tribes on grounds that the Government was not making use of the Tribes' land outside the scope of the seven leases. *Shoshone III*, 93 Fed. Cl. at 462 ("The oil and gas operators who extracted minerals from the seven parcels in this case were doing so under the authority of lease agreements executed by the Tribes themselves."). This fact is not relevant, however. The leases are void, and because granting an implied right to extract resources from the parcels would run afoul of the Nonintercourse Act, the Court of Federal Claims erred when it concluded that the lessees were not trespassers. In light of the guidance provided by the Supreme Court, we decline to treat the leases as creating an implied right for the lessees to extract oil and gas from the seven parcels.

In its final argument, the Government asserts that it has no duty to remove the trespassers from the seven

parcels. In other words, the Government argues that, if the Court of Federal Claims possesses subject matter jurisdiction over Claim II under the Indian Tucker Act, 28 U.S.C. § 1505, the Tribes do not have a cognizable claim under the Act because the Government had no duty to remove the trespassers.

To state a cognizable claim under the Indian Tucker Act, "a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003) ("*Navajo Nation I*") (citing *United States v. Mitchell*, 463 U.S. 206, 216–17, 219 (1983) ("*Mitchell II*"). Elaborating on this requirement, the Court stated:

> Although "the undisputed existence of a general trust relationship between the United States and the Indian people" can "reinforc[e]" the conclusion that the relevant statute or regulation imposes fiduciary duties that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions. Those prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred.

*Navajo Nation I*, 537 U.S. at 506 (quoting *Mitchell II*, 463 U.S. at 219). The Supreme Court recently reiterated that, though the relationship between the Government and Indian Tribes has been described as a trust, "Congress may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee, creating a trust relationship that is 'limited' or 'bare'

compared to a trust relationship between private parties at common law." *United States v. Jicarilla Apache Nation*, 131 S. Ct. 2313, 2323 (2011) (citing *United States v. Mitchell*, 445 U.S. 535, 542 (1980) ("*Mitchell I*") and *Mitchell II*, 463 U.S. at 224).

Indian Tribes, moreover, cannot simply rely on common law duties imposed on a trustee; instead, tribes must point to specific statutes and regulations that "establish [the] fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Jicarilla*, 131 S. Ct. at 2325 (quoting *Mitchell II*, 463 U.S. at 224). Accordingly, "[w]hen 'the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, . . . neither the Government's 'control' over [Indian assets] nor common-law trust principles matter.' " *Jicarilla*, 131 S. Ct. at 2325 (quoting *United States v. Navajo Nation*, 129 S. Ct. 1547, 1558 (2009) ("*Navajo Nation II*")).[11]

In light of this requirement, the Tribes argue that both the 1916 Act and the 1938 Act impose a specific duty upon the Government to eject trespassers from Indian lands, citing *Cherokee Nation*, 21 Cl. Ct. at 576, and *Oenga*, 83 Fed. Cl. at 617–23. Neither of these cases, however, clearly establishes that the 1916 Act or the 1938 Act creates such a duty.[12]

---

[11] Yet, if a specific, trust-creating statute is identified as imposing a duty, common law trust principles can help inform the scope of liability encompassed within such a duty. *See Jicarilla*, 131 S. Ct. at 2325; *White Mountain Apache Tribe v. United States*, 537 U.S. 465, 477 (2003).

[12] In *Navajo Nation I*, the Supreme Court did not address the scope of the duties created by the 1938 Act with respect to oil and gas leases. 537 U.S. at 507 n.11 ("[B]oth the [1938 Act] and its implementing regulations address oil and gas leases in considerably more detail

In *Cherokee Nation*, the court simply held that, for the purposes of a motion to dismiss for a failure to state a claim, the Cherokee Tribe had stated a claim. The Court of Federal Claims concluded that "the language of plaintiff's complaint and the general language of the statutes in question," including the 1938 Act, "might satisfy the requirement[] of" specifically identifying statutes and regulations that create the duty. 21 Cl. Ct. at 576. The Court of Federal Claims explained that "[a]t trial . . . plaintiffs must show with particularity the statutes and regulations applicable to its claim for failure to remove trespassers from the mineral estate and how defendant failed to comply with those requirements." *Id.* at 577. This case does not, therefore, establish that the 1938 Act creates a duty to remove trespassers from Indian lands.

*Cherokee Nation*, moreover, predates *Navajo Nation I*. *Navajo Nation I* made clear that, to state a claim under the Indian Tucker Act, an Indian tribe "must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." 537 U.S. at 490. Accordingly, *Cherokee Nation* merely leaves open the possibility that the Tribes could establish that the Government had a duty to eject trespassers pursuant to the 1938 Act.

The Tribes' reliance on *Oenga*, similarly, does not establish that the Government had a duty to eject trespassers from the seven parcels. The Tribes are correct that in *Oenga* the Court of Federal Claims found that allotted landholders had established that the Government had a

than coal leases. Whether the Secretary has fiduciary or other obligations, enforceable in an action for money damages, with respect to oil and gas leases is not before us.").

duty to remove trespassers from their property. 83 Fed. Cl. at 623. This conclusion was not based on the 1916 Act or the 1938 Act, however. Instead, the Court of Federal Claims concluded that 25 C.F.R. § 162.617 (2001) creates a duty to take action against trespassers. *Oenga*, 83 Fed. Cl. at 620–23. Here, however, the Tribes have not so far relied on this regulation, which was implemented in 2001, to establish that the Government had a duty to remove the trespassers. *Oenga* does not hold that, on the basis of the 1916 Act or the 1938 Act, the Government had a duty to eject the trespassers from the seven parcels; it does not consider those Acts or the duties arising thereunder.

While the Tribes have failed to prove that precedent dictates that the Government has, and had, a continuing duty to remove trespassers from the seven parcels under the statutes and regulations referenced to date, the Government has not convinced us that the contrary proposition is true. And, given its incorrect conclusion that no continuing trespass had been asserted as a matter of law, the Court of Federal Claims has never addressed this issue.[13]

For these reasons, we remand this case to the Court of Federal Claims so that it can, in the first instance, hear argument on and determine whether the 1916 and 1938 Acts, or any other relevant statute or regulation create such a duty.

CONCLUSION

We conclude that the Court of Federal Claims improperly determined that Claim II did not assert a con-

---

[13]    Indeed, the Government never disputed its obligation to remove trespassers, to the extent the lessees could be characterized as such, until its final reply brief before the Court of Federal Claims. When it did so, moreover, it only did so briefly.

tinuing trespass. Because Claim II asserts a continuing trespass, the Tribes can seek damages for trespasses which occurred within six years of the filing of this suit and all trespasses that occurred after the filing of this suit. Before this suit can move forward, however, the Tribes must establish that the Government had a duty to eject trespassers from the seven parcels. The Court of Federal Claims' judgment that Claim II is time-barred by § 2501 is, therefore, vacated; the case is remanded to the Court of Federal Claims to determine whether the Government had a duty to remove trespassers from the seven parcels.

## VACATED AND REMANDED

### COSTS

Each party shall bear its own costs.